GEORGE M. COLVOCORESSES *v.* W. S. WASSERMAN COMPANY, a corporation of the State of Delaware.

(*March* 9, 1937.)

LAYTON, C. J., HARRINGTON and RODNEY, J. J., sitting.

*Dudley C. Lunt* for plaintiff.

*Aaron Finger* (of Richards, Layton and Finger) and *Philip Werner Amram* (of the New York Bar) for defendant.

Superior Court for New Castle County, *Action of Assumpsit*, No. 122, September Term, 1935.

[1] In this letter after specifically referring to Article 5 of the agreement between them of February 11, 1935, relating to the Congress mill tailings and mine dumps and after stating that he understood the defendant company desired to make some other arrangements and the reasons for it the plaintiff submitted his resignation as manager to take effect March 31, 1935.

He further said:

"In reference to the liquidated compensation to which I shall be entitled upon your acceptance of this resignation, as per the third paragraph of Article V of our agreement of February 11th, 1935, it is my understanding that Twelve Thousand Dollars ($12,000) cash which I hereby elect to accept in lieu of a stock interest, will be paid to me by you as soon as the legal situation of the Congress property is definitely cleared through the elimination of the claims or anticipated claims of Jay Burns, but meantime I understand that you will make payment of a portion of this sum monthly at the rate of $500.00 per month, and such advance payments as may actually be made are to be credited to you and to reduce the final payment to be made as above. This payment when completed will be in full discharge of all your obligation to me under this agreement except the initial Five per cent. (5%) interest in the first paragraph of Article V mentioned.

"I shall gladly accept this very fair arrangement and shall ask you to confirm the same by letter or on one of the carbons of this letter."

This letter was addressed to W. S. Wasserman Company, % D. M. Barringer, Jr., and at the bottom of it was marked

"Accepted

"D. Moreau Barringer, Jr."

HARRINGTON, J., delivering the opinion of the Court:

The plaintiff seeks to recover twelve thousand dollars from the defendant company in an action of assumpsit on a contract executed by the parties to this action on February 11, 1935; and the question raised by the demurrer is whether the first count of the plaintiff's declaration, as amended, sets out a cause of action against the defendant. A demurrer was sustained by this court to this count on the declaration as originally drawn, but the plaintiff claims that the amended declaration presents a very different question, and that the demurrer thereto should be overruled.

As in the original argument, it is conceded that whether the plaintiff has a right of action necessarily depends on the meaning of *Article* 5 of the contract declared on. That article, in part, provides:

"In the event Second Party acquires the tailings and dumps covered by said *Congress* Contract, First Party shall be entitled to a five per cent. (5%) non-assessable interest therein, subject, however, to Second Party's right to be reimbursed for all expenditures by it made in acquiring, developing and (or) exploiting said tailing and dump material.

"Second Party will, also, appoint First Party as Manager for the operation of the Congress tailings and mine dumps, with the authority and duty usual to such a position, and with a salary of Five Hundred Dollars ($500.00) per month, starting March 1st, 1935. * * *

"It is assumed that the treatment of the said tailings and dumps will require a period of approximately four years. * * * But since it is recognized by both parties that conditions may arise, which would make it desirable to terminate this employment, option is hereby given to either party to terminate said employment upon giving the other party thirty days' notice of intention so to do, and in the event that First Party's employment is terminated any time during the first year, subsequent to the date of this Agreement, he

shall, in addition to the five per cent. (5%) interest, specified in the first paragraph of this Article, be entitled to receive from Second Party as a liquidated consideration, either the sum of Twelve Thousand Dollars ($12,000.00), or at option of First Party an additional five per cent. (5%) non-assessable interest in all of the Congress property acquired, or to be acquired by Second Party similar in all respects to the five per cent. (5%) interest, hereinabove mentioned."

The provisions of the prior contracts attached to the declaration were thoroughly considered in the opinion of this court in disposing of the previous demurrer, and will not be again considered at any length here.

We will point out, however, that the contract between Reid and the plaintiff, whereby whatever rights the plaintiff had when he made his contract with the defendant company were acquired, among other things, provided for the execution of:

"A good and sufficient conveyance to any and all the mine dumps and mill tailings now located upon any of the Congress Mining claims or other lands belonging to said Congress property, subject, however, to this condition:

"That said conveyance shall be held in escrow and not delivered to Second Party until and unless First Party, or Second Party on his behalf, shall, in due season and pursuant to the terms of the Congress Contract, and this instrument, acquire a valid and legal title to the same by completing and carrying out all of the terms and conditions of the 'Congress Contract' and this instrument, including the full payment of the remainder of the purchase price."

The allegations in paragraph 2 of the amended declaration, therefore, do not set out all of the provisions of the Reid contract with the plaintiff, and to that extent are inconsistent with certain other provisions of that contract, which by reference are expressly incorporated in it.

The court sustained the demurrer to the original declaration because the plaintiff's rights necessarily depended on the acquisition by the defendant of title to the mill tailings and mine dumps on the Congress property, and because the declaration, when read in connection with the contracts attached to it, and composing a part of it, did not allege the acquisition of any such title by him.

As the defendant points out, except for an alleged parol modification of the contract declared on, with respect to the time and method of the payment of the twelve thousand dollars alleged to be due the plaintiff, the difference between the original and the amended count consists almost entirely in allegations of what the parties intended by the use of the words "acquire" or "acquired" and, therefore, how the plaintiff claims the contract sued on should be construed.

Where, as in this case, the language of the contract is not in any sense ambiguous, its meaning is ordinarily a question of law for the court to ascertain from the instrument itself, and allegations as to the intent of the parties with respect to the meaning of the words used, and whether such intent is shown by subsequent acts, or by the declaration of the parties, made at or about the time of the execution of the contract, or otherwise, are usually of no importance. *McCabe v. Baltimore Trust Co.*, 7 *W. W. Harr.* (37 *Del.*) 116, 180 *A.* 780; *Valentine v. Shepherd*, 19 *Ariz.* 241, 168 *P.* 643; *Penn Steel Casting, etc., Co. v. Wilmington Malleable Iron Co.*, 1 *Penn.* 337, 41 *A.* 236; *Restatement, Law of Contracts*, § 230; *Wig. on Ev.*, § 2463, pages 3486, 3488; see, also, *Jordan Piano Co. v. Lewis*, 4 *W. W. Harr.* (34 *Del.*) 423, 154 *A.* 467.

In *Valentine v. Shepherd*, 19 *Ariz.* 241, 168 *P.* 643, 644, *supra,* the plaintiff sued for the breach of a written contract, which provided for the sale to the plaintiff by the defendant of cattle branded in a certain specified manner. The plaintiff alleged that, notwithstanding the express provisions of the contract, it was the understanding of both parties when it was made that it was, also, to include cattle branded in a somewhat different manner, and that the defendant had failed to deliver the cattle thus branded. The defendant demurred to the plaintiff's declaration. That demurrer was overruled, but the court above, in overruling the court below said: "He [plaintiff] would have the court

enforce a different contract than the one he exhibits as the agreement between himself and appellant. Now, if the understanding of parties to a contract may be substituted for the contract as written out and signed by them, the appellee's explanation that cattle in three brands were intended to be conveyed instead of the cattle in one brand, as appears from the wording of the contract, may be permitted to stand. This is not the law, however. Where the language used by the parties to express the terms and conditions of their contract is plain and unambiguous, their intention or understanding is to be found in their contract, and not from the *ex parte* assertions of either party."

In *Section* 230 of the *Restatement of the Law of Contracts,* the following statement, also, appears:

"The standard of interpretation of an integration, except where it produces an ambiguous result, or is excluded by a ruling of law, establishing a definite meaning, is the meaning that would be attached to the integration by a reasonably intelligent person acquainted with all operative usages, and knowing all the circumstances prior to and contemporaneous with the making of the integration other than oral statements by the parties of what they intended to mean."

Paragraph 3 of the amended declaration, among other things, alleges:

That "the defendant, through its officers, by parol and by writings, did declare, express and affirm at and about the time of the execution of said agreement and thereafter * * * that the meaning and intention of the word acquire, with reference to the said mill tailings and mine dumps, set forth in the next foregoing averment, was the true intent and meaning of the plaintiff and of the defendant, as expressed in their said agreement."

Paragraph 4 alleges: "And the plaintiff further avers that by said payment and said assignment, the defendant acquired the said mill tailings and mine dumps within the meaning and intention of the said agreement between the

plaintiff and the defendant; and the plaintiff further avers that the said defendant, through its officers and agents, both by parol and in writing, after the payment by the defendant of the said sum of Six Thousand Dollars, and after the said assignment by the plaintiff to the defendant of the rights secured to the plaintiff, or his assigns, by the Reid Agreement, did declare and affirm that it had acquired the said mine dumps and mill tailings, and did offer to various parties an interest therein."

Paragraph 5, also, alleges that, pursuant to the agreement declared on, the plaintiff was appointed manager for the operation of the said mill tailings and mine dumps from and after the first day of March, A. D. 1935; that he performed the duties required of him by that agreement, and was paid for his services pursuant to its provisions.

For the purpose of this argument, the truth of all allegations properly pleaded is admitted, and because of these allegations the plaintiff claims that whatever the true meaning of the contract may be the defendant company is estopped to deny that it had acquired title to the mill tailings and mine dumps of the Congress property, though it is not alleged that the full agreed purchase price for that property had ever been paid.

In *Lewis v. Coxe*, 5 *Harr.* 401, this court, in commenting on the meaning of *estoppel in pais*, said it was "a principle of morals as well as law, that a man shall [should] not act so as to mislead another, and induce him by an assertion of a fact, or the withholding a statement he was bound to make, to act in a way that would be prejudicial to himself."

In *Donovan v. Maloney*, 3 *Boyce* 453, 84 *A.* 1032, this court, also, said: "Where a person by his conduct induces another to believe in the existence of a particular state of facts, and the other acts thereon to his prejudice, the

former is estopped * * * as against the latter, to deny that that state of facts does in truth exist." See, also, *Graham v. National Bank of Smyrna,* 2 *W. W. Harr.* (32 *Del.*) 264, 122 *A.* 85, and cases cited.

To use the quaint language of Lord Chief Justice Coke, *estoppel* is so called "because a man's own act or acceptance stoppeth or closeth up his mouth to allege or plead the truth." 21 *C. J.* 1059.

That these principles are applied in courts of law, as well as in courts of equity, is now beyond question. *Lewis v. Coxe,* 5 *Harr.* 401; *Donovan v. Maloney,* 3 *Boyce* 453, 84 *A.* 1032; *Graham v. National Bank of Smyrna,* 2 *W. W. Harr.* (32 *Del.*) 264, 122 *A.* 85; *La Rosa v. Nichols,* 92 *N. J. Law* 375, 105 *A.* 201, 6 *A. L. R.* 412; *Big. on Estoppel,* 777.

When a court is asked to apply the law of estoppel, a consideration of the underlying general principles is essential; but after all in its final analysis each case must depend on its own facts. See *De Tchihatchef v. The Salerni Coupling, Ltd.,* (1932) 1 *Ch. Div.* 330; *Graham v. National Bank of Smyrna,* 2 *W. W. Harr.* (32 *Del.*) 264, 122 *A.* 85.

The general rule is frequently laid down that the representation relied on to operate as an estoppel must be a statement of material fact (*Lewis v. Coxe,* 5 *Harr.* 401; *Donovan v. Maloney,* 3 *Boyce* 453, 84 *A.* 1032; *Graham v. National Bank of Smyrna,* 2 *W. W. Harr.* (32 *Del.*) 264, 122 *A.* 85), and not a mere opinion, or a statement in the nature thereof relating to a proposition of law (*Bigelow on Estoppel,* 634, 635). This is because "the representation, in order to work an estoppel, must be of a nature to lead naturally, *i. e.,* to lead a man of prudence to the action taken." *Bigelow on Estoppel,* 634.

Mr. Bigelow, also, says: "The rule in regard to statements of opinion and statements of law is, it seems, based

upon the ground that the truth is uncertain, or that the person to whom the statement is made knows as much about the matter as the other." *Bigelow on Estop.,* 635; see, also, *Sturm v. Boker,* 150 *U. S.* 312, 14 *S. Ct.* 99, 37 *L. Ed.* 1093.

When the facts clearly justify it, the law of estoppel will prevent the exercise of a clear and otherwise unquestioned contract right in defense of an action brought. *Douglass & Varnum v. Village of Morrisville,* 84 *Vt.* 302, 79 *A.* 391; *De Tchihatchef v. The Salerni Coupling, Ltd.,* (1932) 1 *Ch. Div.* 330; 21 *C. J.* 1201. And, without any discussion as to the line of demarcation between a statement of fact and a statement relating to a proposition of law, estoppel has even been invoked to prevent the construction of a doubtful contract in accordance with its real intent and meaning, when that contract has been previously construed otherwise by a person having rights under it, and the other elements essential to the application of the law of estoppel against that person, exist. *Calgary Milling Co. v. Amer. Surety Co. (Canada),* 3 *West. Week. Rep.* 98 (cited and commented on by the court in *De Tchihatchef v. The Salerni Coupling, Ltd.,* (1932) 1 *Ch. Div.* 330) ; see, also, *Flint v. Johnson,* 59 *Vt.* 190, 9 *A.* 364.

In *De Tchihatchef v. The Salerni Coupling, Ltd.,* (1932) 1 *Ch. Div.* 330, *supra,* the court said: " * * * Without attempting to formulate any precise rules, it seems to me that it is sufficient, so far as this case is concerned, to say that if a person authorizes or permits another to make a representation for the purpose of it being acted upon, and it is acted upon, that person cannot afterwards be heard so say that the representation is not true." The court, also, added: "This applies even if the representation is as to the legal effect of the document, if there is no qualification in the representation suggesting that the document, and not its effect as represented, is to govern the relationship of the parties."

In that case, Fitzgerald, the plaintiff's intestate, had made a contract with the defendant company, whereby he was to purchase from it a specified minimum number of mechanical joints of a certain type during the first and subsequent years of a fifteen year contract. That contract contained a clause whereby Fitzgerald had the right to assign "the benefit of this (that) agreement" to a company of a certain specified size, to be organized by him in France. In the event of an assignment to the French Company by Fitzgerald, it was, also, provided that the name of the assignee should be deemed to be substituted in the contract with the Salerni Company.

With the knowledge and consent of Fitzgerald, the Salerni Company issued a prospectus offering for public subscription, at par, 1,500,000 shares of the company. That prospectus recited its contract with Fitzgerald, and that he was bound, by its terms, to purchase a specified number of couplings each year, for fifteen years. Fitzgerald subsequently assigned his contract with the Salerni Company to the French Company, formed by him, and on the question being raised as to whether he was absolved from responsibility on the Salerni contract, as we have already pointed out, the court held that he was estopped to rely on that provision of his contract. This was because the Salerni Company had sold stock to the public on the representations made in the prospectus, and by reason thereof had assumed certain responsibilities.

In *Calgary Milling Co. v. Amer. Surety Co.*, 3 *West. Week. Rep.* 98, *supra,* commented on in (1932) 1 *Ch. Div.* 330, the plaintiff, the owner, made a contract with a builder covering certain construction work. The builder gave a bond on which the American Surety Company was the surety. A question as to what payments were required to be made by the owner to the contractor during the course of the work was subsequently raised. Because of this ques-

tion, and to prevent possible defenses in case of a subsequent suit on the surety bond, the plaintiff, the owner of the building, communicated with the Surety Company and requested it to interpret the contract with respect to the question raised. In that letter, it, among other things said: " * * * And what, in your opinion, is our obligation to you in respect to same" (meaning the building contract). The Surety Company replied by letter in which it, in substance, stated that after carefully reading the contract it was of the opinion that payments to the contractor should be made in a certain specified manner. These payments were made by the owner, and in a subsequent action brought by it against the Surety Company, on its bond, the court applied the law of estoppel because of the letter above referred to.

In *Flint v. Johnson & Babbitt,* 59 *Vt.* 190, 9 *A.* 364, the proceeding was in chancery. The parties were partners and had executed a dissolution agreement. A Master in Chancery had found that before that contract was excuted it was read to the Flints and to Johnson; that the question was then raised as to whether, or not, the debts due the firm, whether collectible or uncollectible, would be considered in determining the amount to be paid by Johnson and Babbitt on their share of the firm debts, and that Johnson had declined to make the agreement merely on the basis of what the Flints might succeed in collecting on debts due the firm; that the contract was subsequently executed by Johnson and Babbitt in the belief that it would include all debts due the firm, whether collectible or uncollectible, and that they would not otherwise have executed it. That the Flints knew and understood that Johnson and Babbitt had that understanding, and neither of them suggested that the contract would bear any other construction; that also relying on the advice of counsel that their construction was right Johnson and Babbitt allowed the accounting to proceed without in-

troducing testimony bearing on the question of whether diligence had been used by the Flints in collecting debts due the firm, which, but for their understanding as to the meaning of the contract, they otherwise would have done.

With one judge dissenting, the court held that the contract, as signed, if construed in accordance with the claims of the Flints, did not express the understanding of Johnson and Babbitt as to its meaning at the time of its execution, and, to allow a different construction than the one that, by their silence, the Flints induced Johnson and Babbitt to believe would be put on it, would operate as a fraud. They further held that the facts would justify the court in ordering a reformation of the contract and applied the law of estoppel.

Particularly in view of the fact that the complainants certainly, in part, relied on the advice of counsel, as to the proper construction of the contract, when they signed it, this would seem to be an extreme case, and of very little persuasive value.

When read in connection with the facts proved, none of the general statements made in any of the other cases cited sustain the plaintiff's claim that it appears from the allegations of the declaration that the defendant company is estopped to rely on the real intent and meaning of the contract sued on, as ascertained by this court.

As we have seen, in order to estop the defendant from relying on the real meaning of that contract, the plaintiff must have been misled by the defendant and thereby induced to sign it to his prejudice by some clear and positive misrepresentation with respect to its real meaning before he executed it. See *Lewis v. Coxe*, 5 *Harr.* 401; *Donovan v. Maloney*, 3 *Boyce* 453, 84 *A.* 1032; *Graham v. National Bank of Smyrna*, 2 *W. W. Harr.* (32 *Del.*) 264, 122 *A.* 85.

When an estoppel is relied on in pleadings, they must meet and remove by anticipation every possible answer of the other party (*Shipmans' Com. Law P. L.* 428, 430) ; and every essential allegation must, also, be pleaded with particularity and precision (21 *C. J.* 1247).

Paragraphs 3, 4 and 5 of the amended declaration above quoted, in substance, alleged:

3. That "the defendant, through its officers * * * did declare, express and affirm at and about the time of the execution of said agreement and thereafter" that the meaning and intent of the word acquire was, as is alleged by the plaintiff.

4. That the defendant, "through its officers and agents * * * after the payment by the defendant of the said sum of six thousand dollars, and after the said assignment by the plaintiff to the defendant of the rights secured to the plaintiff, or his assigns, by the Reid agreement, did declare that he had acquired the said mine dumps and mill tailings."

5. That pursuant to the agreement declared on, the plaintiff was appointed manager for the said mill tailings and mine dumps; that he performed the services required of him by that agreement, and was paid pursuant to its provisions.

Without considering whether the declaration alleges anything more than the mere expression of an opinion by the defendant, with respect to the meaning of the contract of February 11, 1935, applying the principles above stated, it does not appear from it that the plaintiff was actually misled by any act or statement of the defendant, and thereby induced to execute that contract to the prejudice of his rights.

It is alleged that the defendant's officers made certain representations as to the meaning of the word acquire at

or about the time of the execution of the contract declared on, but that is not sufficient. See *Bigelow on Estop.*, 774, 775; 21 *C. J.* 1249. And this conclusion is not affected by any allegations relating to subsequent acts or declarations of either party, or by the plaintiff's letter to the defendant of March 22, 1935, and whether covered by the allegations of paragraph 6 of the declaration, or otherwise. To be effective the parol modification of the orginial contract of Feburay 11, 1935, alleged in Paragraph 6 of the declaration, must depend on the meaning of that contract and can have no effect if there was no such contract as is alleged by the plaintiff. This is clearly recognized by other allegations in the declaration, including allegations in that particular paragraph.

Nor does it appear that the officers or agents, who made the alleged statements with respect to the meaning of the words acquire and acquired, had the authority to make any such statements. See *Atlantic Refining Co. v. Ingalls*, 7 *W. W. Harr.* (37 *Del.*) 503, 185 *A.* 885; *Greenspon's Sons Iron & Steel Co. v. Pecos Valley Gas Co.*, 4 *W. W. Harr.* (34 *Del.*) 567, 156 *A.* 350.

For the reasons above given, the demurrer to the amended declaration is sustained.