JOSEPH B. WILSON, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

ALICE FYNES WILSON, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket Nos. 86618, 86619.   Promulgated September 6, 1938.

---
[3] SEC. 23. DEDUCTIONS FROM GROSS INCOME.

In computing net income there shall be allowed as deductions:

&ast; &ast; &ast; &ast; &ast; &ast; &ast;

*William L. Latimer, Esq.*, for the petitioners.
*Carroll Walker, Esq.*, and *Chester C. Guy, Esq.*, for the respondent.

OPINION.

KERN: The first issue is a very narrow one, whether petitioners are to be denied the deduction as a capital loss on the ground that they made a short sale, although they did not intend to make a short sale and were then long on the stock sold and could have made delivery immediately, but, in fact, did not make delivery until several days later.

The record is silent on what stock certificates were actually delivered by the broker on the sales, but the Federal stamp tax imposed under section 723 of the Revenue Act of 1932 and charged by the broker to petitioners on the transactions, and the well known rule of the New York Stock Exchange requiring delivery within twenty-four hours, raises a strong presumption that deliveries of the stock sold were made immediately and that the certificates actually delivered to the purchaser, therefore, were not those held by petitioners and received by the broker from them some four to eleven days afterward, but were certificates either held by the broker himself in "street names" or borrowed by him for just such an emergency. Upon this presumption respondent strongly relies to support his contention that the "sale" by the broker was necessarily a short sale made on petitioner's behalf. He disregards, however, the question of whether the intent of the petitioners was to make a short sale.

We shall assume in respondent's favor that the broker did not deliver to the market purchaser petitioners' certificates.

A "short sale", as defined by the Supreme Court in *Provost* v. *United States*, 269 U. S. 443, 450, "is a contract for the sale of shares which the seller does not own or the certificates for which are not within his control so as to be available for delivery at the time when, under the rules of the Exchange, delivery must be made." In that case the Supreme Court held that both the "loan" of stock certificates by one broker to another and their "return" after the seller has fulfilled his obligation to the borrowing broker constituted transfers of title to the certificates physically passing, and as such were taxable transfers under the Federal stamp tax then applicable. The above definition of a short sale would not apply to the circumstances here presented, but, as we intimated in *Frances Bartow Farr, Executrix*, 33 B. T. A. 557, 561, the Supreme Court may not have intended the definition as an "all-inclusive one." We thereafter held in *Arthur S. Kleeman*, 35 B. T. A. 17, that where the taxpayer clearly intended to sell certain shares short and made deliveries from certificates later obtained, the sale was a short sale, notwithstanding the

fact that the taxpayer was, during the transaction, "long" on the same stock in another account. We allowed the taxpayer's intent, in other words, to govern the nature of the transaction.

In *Provost's* case, *supra*, the Supreme Court set out with great particularity the various sales which successively took place in completion of the transaction of a so-called short sale, "in each of which", the Court pointed out, "there is either a sale or a complete transfer of all the legal elements of ownership." They are:

> (1) the sale of the stock by the person effecting the short sale, followed by the transfer and delivery of the certificates for the borrowed stock to the purchaser's broker; (2) the transfer of the shares from the lender to the borrower, who uses them for delivery on the customer's short sale; (3) the purchase by the borrowing broker of the stock required to repay the loan; and (4) the transfer and delivery by the borrower to the lender of the certificates for the purchased shares to replace the shares borrowed. * * *

Physical transfer of the certificates may accompany all four transfers but usually accompanies only (1) and (4). We touch upon these particulars merely to emphasize the fact that, as the Supreme Court's definition of a short sale quoted above may not have been intended to be definitive, so, likewise, its analysis of the several steps of legal import involved in a short sale may not have been intended to comprehend the situation of a sale by a person then "long" on the stock, much less that of a person, as here, both long on the stock and not intending to make a short sale but to make later delivery of certificates held at the time of the sale. Situation (1) above in such circumstances would require further analysis. The Court speaks of the sale "by the person effecting the short sale" assuming, apparently, that the broker acts for his principal, the short-seller, and effects the sale for him by delivery of the borrowed certificates. In doing so, obviously, the broker, as agent, merely carries out the will of his principal and acts within the scope of his authority in procuring by "loan", or more accurately, as the Court has held, by purchase, the necessary certificates for prompt delivery. But what if the seller does not intend to sell short? The broker then would have no implied authority to obtain other certificates and deliver them for the seller. On the contrary, the broker then becomes a principal acting for himself if he chooses to sell immediately and to deliver other certificates. Two sales are effected—the sale by the broker to the purchaser on the market and the sale by the "seller" to the broker.

While our prior decisions have not carried the analysis so far in words, it is obvious that this principle has been controlling. In *Francis S. Appleby*, 31 B. T. A. 533, appeal dismissed April 8, 1935, petitioner owned shares of certain stocks and held them in his safe deposit box. He ordered his broker to sell them on December 30, 1930, which was done, but no delivery was made until January 5,

1931. We held that it was not a short sale, that "failure to make delivery was a mere inadvertence, for he was at all times in position to make a complete transfer", and that the loss was sustained in the earlier year. In *C. B. Ferree*, 32 B. T. A. 725; affd., 84 Fed. (2d) 124, the situation was similar but, if anything, went further. There the petitioner had the certificates in his safe deposit box. On December 19, 1929, he sold part of the certificates through his broker and made delivery on the next day. The remainder he instructed the broker to sell on December 27, identifying them as those in the box. The broker sold on December 31, but no delivery was made. Finally, a month later, on January 31, 1930, and on February 3, 1930, petitioner bought certain certificates of the same stock through the broker, the broker delivering only the balance after deducting a number equal to those sold on December 31. We held the sale not a short sale and that the loss was sustained in 1929 when the sale became effective, saying (at p. 726):

> * * * Indeed, if we are to treat the broker as a mere agent, it must be assumed that in behalf of his principal, the petitioner, he made a delivery as required by the rules of the Stock Exchange, and thus completed the sale. It was to his own broker that the petitioner was then obligated to deliver the certificates, and we can not regard his delay as postponing the realization of loss. * * *

In *Dee Furey Mott*, 35 B. T. A. 195, the same question of the year of loss was involved. The taxpayer directed sale on December 30, 1930, of certain stock which she held in a safe deposit box, and sale was then made by her broker, but there was no delivery by the taxpayer until January 2, 1931. The Commissioner contended that it was a short sale, and that in any event no title passed until delivery of the certificates. We answered these two objections, respectively, as follows (at p. 197, 201):

> * * * Here the petitioner owned the shares and they were within her control and available for delivery. She intended to sell the shares that she owned, and it is stipulated that they were sold. Mere failure to deliver certificates is not alone enough to establish a short sale. * * *
> * * * The petitioner intended to sell in 1930 specific shares then available for delivery and the broker intended to sell those shares. And, as said in the *Ferree* case, the Sales Act allows delay in delivery.

The respondent admits the force of these decisions, but relies on our decision in *Frances Bartow Farr*, *supra*, which involved precisely the same question as is here presented, whether section 23 (s) of the Revenue Act of 1932 was applicable in the circumstances, so as to render the resulting loss or gain not one on capital assets. There the taxpayer had certain stock on January 1, 1931, which he had held for more than two years. He "sold short" a certain number of shares of the same issue of stock in 1931 and "covered the short sales" in March 1932 by delivery of the aforesaid certificates. No further facts

appear on the intention of the parties, and since the language quoted above is apparently that of the stipulation, we must assume that the taxpayer intended to sell short. On that assumption, the narrow question decided by the case is whether such an intended short sale could be a "short sale" within the meaning of section 23 (s) if the seller at the same time held available, at the time of the order to sell, certificates which he might have delivered. Without discussing the question of intent, which appears to have been assumed, we held that in the circumstances presented the transaction was a short sale. *Ibid*, p. 561. We have already pointed out that the same rule, where intent was evident, was followed in *Kleeman's* case, *supra*. In the course of our opinion in *Farr's* case, however, we defined a short sale as follows (at p. 561):

> * * * If the shares sold are not furnished by the seller at the time of the sale but are supplied by the broker, the transaction is a short sale and sets in motion the short sale process. The fact that a transaction is a short sale must appear prior to the time when the broker must make delivery in accordance with the rules of the exchange. A transaction, which at that time, or earlier, is made as a short sale, forever remains a short sale, regardless of the manner in which it is closed, that is, regardless of whether it is closed by a covering purchase or by the delivery of shares which the seller has owned for some time.

We are of the opinion that *Farr's* case for the reasons stated is clearly distinguishable from the instant case, and that the definition of a "short sale" there set out must be qualified by the condition that it is intended to be a short sale by the seller. Since our decision in that case, the Third Circuit Court has affirmed our earlier decision in *Ferree's* case, *supra*, and the Second Circuit Court in *Ruml* v. *Commissioner*, 83 Fed. (2d) 257, has reversed our decision in that case, 31 B. T. A. 534. The facts of that case go beyond the situation here, and the Circuit Court's opinion states articulately the theory foreshadowed in our own decisions before *Farr's* case, cf. *C. B. Ferree*, *supra*, at p. 725.

In *Ruml's* case the taxpayer owned certain stock in December 1928 which was deposited with a bank as collateral for a loan. As the Circuit Court said:

> * * * He desired to sell that stock at the then market, and instructed his broker to do so, advising him how the shares were held as collateral and telling him that there might be some delay in making delivery. His broker informed him that the stock would be sold, and that petitioner might make delivery to the broker at his convenience when he paid off the loan or substituted other collateral to release the shares.

The broker sold the same number of shares of the same stock as petitioner held in December, and the taxpayer delivered part of his certificates in the same month, but the majority not until February 1929.

On January 1, 1929, the petitioner received a statement from the broker indicating that he was being carried short 2,500 shares of the stock, and upon inquiring what that meant, was told, "That is simply the way we carry it until you deliver it." The petitioner neither intended to make what is known as a short sale nor instructed his broker to do so, though he did direct his broker to sell the shares, leaving the broker free to make the sale as he might.

The question was whether a short sale had been made, and, if so, whether the loss was realized in 1928 or 1929. The court continues:

It is clear that the petitioner intended to sell the specific shares he owned and only those. If the broker made a short sale to his customer, it was for his own account, not for the petitioner who had authorized no short sale for his account. It seems to us clear that the transaction between the petitioner and the broker was a sale by the petitioner to the broker of the specific shares pledged to the bank, under an understanding with the broker that certificates therefor were to be later delivered. The result was that the petitioner became bound in December, 1928, to deliver to the broker the shares sold to him. Actual delivery was not made that month, and so the transaction in that respect was not completed, but we are primarily concerned with whether or not the loss evidenced by the sale was realized within the meaning of that term as applied to income taxation * * * But when the evidence of realization is a sale of personal property, it is not always necessary to deliver the property before there may be a deduction of a loss. It is enough that the obligation to deliver is so fixed that the loss is reasonably certain in fact and ascertainable in amount. * * *

Here we are not concerned with the precise time when title passed from petitioner, as was so in *Ruml's* case, *supra*, and others discussed, but only with the point whether title to the shares held by petitioner passed so as to create a loss on capital assets. Under both the common law and the Uniform Sales Act the seller's intent will govern in cases of sales of stock such as the instant case, cf. *Arthur E. Otto*, 37 B. T. A. 479; so that delivery was not necessary to effect the sale, but delivery was, in fact, made by the petitioner here as soon as he could conveniently do so. Petitioner here had at all times complete dominion over the certificates in question, and his arrangement with his broker was very similar to that involved in *Ruml's* case.

We think the instant case is ruled by that case; that there was here a sale by petitioner of certificates which he had held for more than two years; that this sale was not a short sale, and was not, therefore, within the terms of section 23 (s); and that a capital loss thereby resulted which should have been allowed.

We pass now to the second question, of the rate of depreciation petitioner Alice Wilson claims, that 4 percent and not 2½ percent should have been allowed in respect of a frame, stuccoed dwelling house. Since the evidence is insufficient to establish the probable life of the house, we must hold on this point for the respondent.

*Decision will be entered under Rule 50.*