GEORGE W. S. SWENSON AND RUTH E. SWENSON, PETITIONERS, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 81911. Filed October 31, 1961.

*J. Neil Morton, Esq.,* and *John M. Sullivan, Esq.,* for the petitioners.

*Leonard A. Hammes, Jr., Esq.,* for the respondent.

TRAIN, *Judge:* Respondent determined a deficiency in petitioners' income tax for the calendar year 1957 in the amount of $14,607.86.

The issues for decision are:

(1) Whether George W. S. Swenson realized compensation income on the disposition of stock acquired under an employee stock option plan by disposing of the stock within 6 months after the transfer of such stock to him; and

(2) Whether George W. S. Swenson realized a short-term capital gain on the sale of the stock because he did not hold the stock for more than 6 months.

### FINDINGS OF FACT.

Some of the facts have been stipulated and are hereby found as stipulated.

George W. S. Swenson, also known as George W. Swenson, and Ruth E. Swenson are husband and wife and reside in St. Paul, Minnesota. For the taxable year 1957, they filed a timely joint Federal income tax return with the district director of internal revenue for the

district of Minnesota. For the purposes of this opinion, George W. S. Swenson will be referred to as the petitioner.

Petitioner is an executive employee of Minnesota Mining and Manufacturing Company (hereinafter called the company) and has been such since prior to May 11, 1954. The company was incorporated in Delaware and has its home office in Minnesota. At all times involved herein, the outstanding common stock of the company has been listed on the New York Stock Exchange.

On May 11, 1954, the stockholders of the company adopted the "Executive Restricted Stock Option Plan of Minnesota Mining and Manufacturing Company" (hereinafter referred to as the plan). The pertinent provisions of the plan are as follows:

For the purpose of encouraging executive employees to acquire common stock in Minnesota on a basis mutually advantageous to the executive employees and to Minnesota and to some, if not all, of its domestic and foreign subsidiaries, it is the opinion of members of Minnesota's Board of Directors that options for five (5) years, on not to exceed 150,000 shares of its common stock without par value, be offered to executive employees of Minnesota and its subsidiaries in accordance with the following Executive Restricted Stock Option Plan:

### Section 1.

### DEFINITIONS

(a) "Plan" as used herein shall mean Minnesota Mining and Manufacturing Company's Executive Restricted Stock Option Plan.

(b) "Minnesota" as used herein shall mean Minnesota Mining and Manufacturing Company.

(c) "Participant" as used herein shall mean an executive employee of Minnesota designated as a Participant by the Committee appointed to administer the Plan.

(d) "Agreement" as used herein shall mean the Option Purchase Agreement entered into between Minnesota and a Participant in the form approved by the Committee.

(e) "Option" shall mean the Participant's right to purchase shares subject to the terms and conditions of the Option Purchase Agreement.

(f) "Committee" shall mean the Committee of directors appointed to administer the Plan in accordance with Section 2 hereof.

(g) "Date Option is Granted" shall mean the date of the Option Purchase Agreement.

### Section 2.

### ADMINISTRATION

\*         \*         \*         \*         \*         \*         \*

(d) Make appropriate adjustments in the price of the shares and the number allotted if there is any change in the capital stock of Minnesota as a result of a stock dividend, stock split, recapitalization, merger or consolidation of Minnesota with any corporation or otherwise.

### Section 3.

### SHARES SUBJECT TO THE PLAN

The Committee from time to time may provide for the option and sale in the aggregate of up to 150,000 shares of the common stock of Minnesota.

Shares shall be made available in the discretion of the Board of Directors from authorized unissued or reacquired common stock, which latter stock is hereinafter referred to as Treasury Stock. In the event any option granted to a Participant lapses, is cancelled or otherwise terminated, as to any and all of the shares covered by such option, the Committee may make such shares so covered available to other Participants in accordance with the Plan.

*     *     *     *     *     *     *

Section 5.

OPTION, PRICE AND PAYMENT

(a) Shares of common stock shall be optioned from time to time at one hundred per centum (100%) of the fair market value of such common stock on the date the option is granted. The fair market value shall be determined by the method prescribed in Section 81.10(c) of Regulations 105 issued by the United States Treasury Department.

(b) Twenty-five per centum (25%) of the total number of shares under option may be purchased one (1) year from the date of the Agreement; twenty-five per centum (25%) two (2) years from the date of the Agreement; twenty-five per centum (25%) three (3) years from the date of the Agreement; and twenty-five per centum (25%) four (4) years from the date of the Agreement. This right is to be cumulative.

(c) Options not exercised during the four (4) year period provided in subsection (b) of this Section 5 may be exercised in whole or in part from time to time during the remainder of the option period.

(d) In order to exercise his option, the employee shall give written notice to Minnesota's Treasurer at Saint Paul, Minnesota, of his intention to exercise his option and accompany his notice with a certified or cashier's check in full payment for the number of shares purchased, together with a written statement that the shares are purchased by him for investment and not for resale.

(e) No shares shall be issued until full payment therefor has been made and a *Participant shall obtain no rights as a stockholder until shares are issued to him.*

*     *     *     *     *     *     *

Section 8.

DELIVERY OF CERTIFICATE

Minnesota shall not be required to issue or deliver any certificate for its common shares purchased upon the exercise of this option prior to the admission of such shares to listing on any stock exchange on which shares may at that time be listed. In the event of the exercise of this option with respect to any shares subject hereto, Minnesota shall make prompt application for such listing. If any time during the option period Minnesota shall be advised by its counsel that the shares deliverable upon an exercise of the option are required to be registered under the Federal Securities Act of 1933 or that delivery of such shares must be accompanied or preceded by a Prospectus meeting the requirements of such Act, Minnesota will use its best efforts to effect such registration or provide such Prospectus not later than a reasonable time following each exercise of this option, but delivery of shares by Minnesota may be deferred until such registration is effected or such Prospectus is available. *The Participant shall have no interest in shares covered by this option until certificates for said shares are issued.*
[Emphasis supplied.]

On May 11, 1954, pursuant to the plan, the company and petitioner made and entered into an "Option Purchase Agreement" (hereinafter sometimes referred to as the purchase agreement). The purchase agreement was entered into for reasons connected with petitioner's employment.

By reason of the purchase agreement, petitioner became entitled to purchase all or a part of 2,000 shares of common stock of the company at $67.875, the fair market value of the optioned stock on May 11, 1954. On May 18, 1956, the company's common stock was split 2 for 1 and by reason of this, petitioner had the option of purchasing 4,000 shares of stock at $33.9375. The purchase agreement contained the following pertinent provisions:

OPTION PURCHASE AGREEMENT, Effective this 11th day of May, 1954, by and between Minnesota Mining and Manufacturing Company, a Delaware corporation (hereinafter referred to as the "COMPANY") and GEORGE W. SWENSON, an executive employee of the COMPANY or of a Subsidiary of the COMPANY (hereinafter referred to as the "EMPLOYEE"):

WITNESSETH:

The COMPANY desiring to afford EMPLOYEE an opportunity to purchase shares of its Common Stock Without Par Value (hereinafter referred to as Common Stock), through the Executive Restricted Stock Option Plan, approved by the stockholders on May 11, 1954, thereby providing the EMPLOYEE with an added incentive to continue his services with the COMPANY and to intensify his interest in the success of the COMPANY.

Now, THEREFORE, In consideration of the mutual covenants hereinafter set forth and for good and valuable considerations, the parties hereto have agreed, and *do hereby agree, as follows*:

\*　　　\*　　　\*　　　\*　　　\*　　　\*　　　\*

9. *ADJUSTMENTS OR CHANGES IN CAPITALIZATION*

If the EMPLOYEE exercises all or any portion of the OPTION subsequent to any increase in the number of outstanding shares of Common Stock of the COMPANY after the date hereof by reason of a stock dividend or stock split, he shall receive, for the aggregate price paid by him upon such exercise of the OPTION, the number of shares which, if he had purchased shares of Common Stock of the COMPANY at the date hereof for the same aggregate price (on the basis of the price per share set forth in paragraph 3 hereof) and had not disposed of them, he would be holding, at the time of such exercise, as a result of such purchase and any such increases.

10. *EXERCISE OF OPTION*

Subject to the terms and conditions of this Agreement, the OPTION may be exercised by written notice to the COMPANY, 900 Fauquier Avenue, St. Paul 6, Minnesota, attention of the Treasurer, which notice shall state the election to exercise the OPTION and the number of shares in respect of which it is being exercised, shall fix a date (not less than five [5] business days from the date such notice is received by the COMPANY) for the delivery of the certificate or certificates for said shares, shall be accompanied by a certified or bank cashiers check for payment in full of the purchase price for said shares, shall be signed

by the person or persons so exercising the OPTION and, in the event the OPTION is being exercised by any person or persons other than the EMPLOYEE, shall be accompanied by appropriate proof of the right of such person or persons to exercise the OPTION. On the date so fixed, a certificate or certificates for the shares as to which the OPTION has been so exercised, registered in the name of the person or persons so exercising the OPTION, shall be issued by the COMPANY or delivered to or upon the order of such person or persons. All shares issued as provided herein shall be fully paid and non-assessable.

### 11. *PROVISION FOR LISTING AND REGISTRATION OF SHARES*

The COMPANY shall not be required to issue or deliver any certificate for its Common Shares purchased upon the exercise of this OPTION prior to the admission of such shares to listing on any stock exchange on which shares may at that time be listed. In the event of the exercise of this OPTION with respect to any shares subject hereto, the COMPANY shall make prompt application for such listing. If at any time during the OPTION period the COMPANY shall be advised by its counsel that the shares deliverable upon an exercise of the OPTION are required to be registered under the Federal Securities Act of 1933 or that delivery of such shares must be accompanied or preceded by a Prospectus meeting the requirements of such Act, the COMPANY will use its best efforts to effect such registration or provide such Prospectus not later than a reasonable time following each exercise of this OPTION, but delivery of shares by the COMPANY may be deferred until such registration is effected or such Prospectus is available. *The participant shall have no interest in shares covered by this OPTION until certificates for said shares are issued.* [Emphasis supplied.]

\* \* \* \* \* \* \*

### 15. *SAVINGS CLAUSE*

If any provision contained in this Option Purchase Agreement conflicts with any provision of the Executive Restricted Stock Option Plan, the provisions of the latter shall control. The Committee shall be the sole judge as to the interpretation and meaning to be given any provision hereof, and its decision shall be final and binding.

On January 10, 1957, the company's records showed that the stock option account of petitioner had a credit balance of $8,891.98, which he was entitled to apply to the purchase of optioned stock. On the foregoing date, petitioner executed an instrument stating that he wished to exercise his option to purchase 1,000 shares of the company's common stock at $33.9375 per share and delivered the instrument with his personal check for $25,045.52 to the company. The receipt of the check was acknowledged by an interoffice memorandum dated January 14, 1957. On January 14, 1957, the transaction was recorded in the accounting records of the company and on the same day the company requested its St. Paul transfer agent to issue 1,000 shares of stock to petitioner. On January 16, 1957, the transfer agent advised the New York Stock Exchange of the foregoing transaction. On January 16, 1957, the transfer agent issued the stock certificate dated January 16, 1957, and sent it to the First National Bank of Saint Paul, the company's registrar. On January 16, 1957, the fair

market value of the company's stock was $63.75. By telegram dated January 17, 1957, the New York Stock Exchange authorized the First National Bank of Saint Paul to register additional shares of stock inclusive of those issued to petitioner. The stock used for the satisfaction of options exercised under the plan is unissued stock of the company.

If an employee desired to have his stock issued promptly, a special, expeditious procedure could be availed of. Under this procedure, the instrument exercising the option would be hand-carried to the various departments of the company, and the necessary letter taken to the transfer agent on the same day, with instructions to issue the stock on that day. When petitioner exercised his option, he did not request that the special procedure be used.

On July 16, 1957, petitioner instructed his broker, Merrill Lynch, Pierce, Fenner & Beane, to sell 700 shares of the stock which he purchased from the company under the option which he exercised on January 10, 1957. The sale was made July 16, 1957. On July 22, 1957, petitioner's certificate was surrendered to the transfer agent. The net amount received by Swenson from the sale was $66,042.21. [1] For Federal income tax purposes, petitioner reported the gain from this sale as long-term capital gain.

In his notice of deficiency, respondent made the following determinations:

(a) It is held that you realized compensation in the amount of $20,868.75, measured by the difference between $44,625.00, the fair market value of 700 shares of Minnesota Mining and Manufacturing Company common stock on January 16, 1957 when it was transferred to you, and $23,756.25, the amount paid for the stock.

(b) It is held that you realized short-term capital gain in the amount of $21,417.72 on the sale of 700 shares of Minnesota Mining and Manufacturing Company common stock on July 16, 1957. This gain is measured by the difference between $66,042.72, the net selling price, and $44,625.00, the fair market value of the stock on the date of transfer to you.

(c) In Schedule D of your return you reported a long-term capital gain in the amount of $58,792.17. This total consists of gains of $42,286.47 and $16,-505.70 reported on the sale of 700 and 300 shares of Minnesota Mining & Manufacturing Company common stock on July 16, 1957 and August 1, 1957, respectively. The amount of $29,396.09, representing 50% of $58,792.17, was taken into account in arriving at taxable income. The 1,000 shares of stock were transferred to you on January 16, 1957 pursuant to an Option Purchase Agreement granted May 11, 1954, and exercised on January 10, 1957. By reason of the fact that 700 shares of this stock were sold on July 16, 1957, which disposition is within six months from the time it was transferred to you, it is held that the gain

---

[1] The notice of deficiency involved herein shows the said net proceeds of the sale to be $66,042.72, rather than $66,042.21. As a result of making all adjustments required by this discrepancy of 51 cents, the deficiency asserted by respondent is reduced to $14,607.66 rather than $14,607.86 as set forth in the notice of deficiency. The parties have stipulated to this correction.

of $42,286.47 reported on this transaction does not qualify as a long-term capital gain. It has been determined above that you realized compensation in the amount of $20,868.75 when this stock was transferred to you and short-term capital gain in the amount of $21,417.72 when it was subsequently sold. Therefore, adjustment is made here to reduce taxable income by $21,143.24, this represents that portion of the gain of $42,286.47 reported on the sale of the 700 shares of stock which was taken into account in arriving at taxable income. This adjustment reduces the long-term capital gain taken into account from $29,396.09 to $8,252.85 which is 50% of the gain of $16,505.70 realized on the sale of 300 shares of stock on August 1, 1957.

OPINION.

The ultimate question for decision is whether petitioner held his stock for more than 6 months.[2]

It is petitioner's position that the holding period begins when the purchaser acquires substantial contract rights which will ripen into full ownership unless defeated by a breach of contract on the part of the other contracting party. *W. F. Marsh*, 12 T.C. 1083 (1949); *Edward R. Bacon Co.*, a Memorandum Opinion of this Court, affirmed per curiam 158 F. 2d 981 (C.A. 9, 1947); *Mayer v. Donnelly*, 247 F. 2d 322 (C.A. 5, 1957); *C. A. Sporl & Co.*, 40 B.T.A. 829 (1939), affd. 118 F. 2d 283 (C.A. 5, 1941); *Estate of James S. Ogsbury*, 28 T.C. 93 (1947); *Philip J. LoBue*, 28 T.C. 1317 (1957), affd. 256 F. 2d 735 (C.A. 3, 1958). Petitioner contends the rule does not depend upon any right of specific performance, and it has nothing to do with formalities of title or the technicalities of stock issue or transfer.

Petitioner contends that on January 10, 1957, he exercised his option and paid for the stock in full. Petitioner argues that he had satisfied all conditions precedent and nothing further was required of him; therefore, at that time he was in substance the owner of the stock. At the same time, the company became subject to an absolute duty to take all action requisite to establish petitioner's status as owner and holder of the stock. Had the company failed to do so, petitioner argues, it would have been subject to suit in an action to which it could have no defense.

---

[2] SEC. 421. EMPLOYEE STOCK OPTIONS.

(a) TREATMENT OF RESTRICTED STOCK OPTIONS.—If a share of stock is transferred to an individual pursuant to his exercise after 1949 of a restricted stock option, and no disposition of such share is made by him within 2 years from the date of the granting of the option nor within 6 months after the transfer of such share to him—

    (1) no income shall result at the time of the transfer of such share to the individual upon his exercise of the option with respect to such share;

SEC. 1222. OTHER TERMS RELATING TO CAPITAL GAINS AND LOSSES.

For purposes of this subtitle—

    *    *    *    *    *    *    *

    (3) LONG-TERM CAPITAL GAIN.—The term "long-term capital gain" means gain from the sale or exchange of a capital asset held for more than 6 months, if and to the extent such gain is taken into account in computing gross income.

Petitioner contends that if reliance is placed on section 8 of the plan and section 11 of the purchase agreement stating that "The participant shall have no interest in shares covered by this OPTION until certificates for said shares are issued," it would become necessary to assert that this language renders the whole option void and relieves the company of any obligation except to return Swenson's money. Petitioner contends that "an interest in the shares" has never been regarded as necessary to the commencement of a holding period, citing *W. F. Marsh, supra,* as an example.

In the alternative, petitioner contends that if the accrual of substantial contract rights does not start the holding period, then the accrual of an obligation to transfer (as in the case of stock exchange transactions) does not terminate the holding period. Petitioner contends that if January 16, 1957, is taken as the date of inception, consistency requires that July 22, 1957 (the date of surrender of his stock certificates), be taken as the date of disposition, since prior to that date the purchaser had no "interest in the shares" or any other right except a right to sue him for damages for nondelivery.

We do not agree with petitioner's contentions. In determining when petitioner's holding period began, for the purposes of section 421 and section 1222(3), we must look to the date of acquisition. In common understanding, to hold property is to own it. In order to own or hold one must acquire. The date of acquisition is, then, that from which to compute the duration of ownership. *McFeely* v. *Commissioner,* 296 U.S. 102 (1935); *Helvering* v. *San Joaquin Co.,* 297 U.S. 496 (1936). See also sec. 1.421–1(f), Income Tax Regs., 1954 Code.[3]

In determining when petitioner acquired the stock in question, we must look to the applicable State law. *Warburton* v. *White,* 176 U.S. 484 (1900); *Tyler* v. *United States,* 281 U.S. 497 (1930); *E. F. Blaise,* 42 B.T.A. 1232 (1940), reversed on another issue 126 F. 2d 383 (C.A. 10, 1942). Since most of the contacts with the stock were in Minnesota, we look first to the law of Minnesota. Under Minnesota law, the rights of stockholders in respect to the issue, ownership, and transfer of stock in a corporation are governed by the laws of the State under which the corporation was formed. *Axford* v. *Western Syndicate Inv. Co.,* 141 Minn. 412, 168 N.W. 97 (1918), 170 N.W. 587 (1919); *State* v. *Probate Court,* 142 Minn. 415, 172 N.W. 318 (1919); *First Nat. Bank* v. *Gustin Minerva Con. Min. Co.,* 42 Minn.

---

[3] Sec. 1.421–1 Meaning and use of certain terms.

*     *     *     *     *     *     *

(f) *Transfer.* For the purpose of section 421, the term "transfer", when used in reference to the transfer to an individual of a share of stock pursuant to his exercise of a restricted stock option, means the *transfer of ownership* of such share, or the *transfer of substantially all the rights of ownership.* Such transfer must, within a reasonable time, be evidenced on the books of the corporation. [Emphasis supplied.]

327, 44 N.W. 198 (1890); *Woodward* v. *Sonnesyn*, 162 Minn. 397, 203 N.W. 221 (1925). Since the company was incorporated in Delaware, we must, therefore, look to the law of that State.

Whether petitioner acquired sufficient rights of ownership to make him the owner of the stock prior to January 16, 1957, depends on the intent of the parties as evidenced by their contract.[4] The intent and meaning of a contract necessarily depends on the language used. *Pope* v. *Landry*, 39 Del. 437, 1 A. 2d 589 (1938). In *Colvocoresses* v. *W. S. Wasserman Co.*, 38 Del. 253, 190 Atl. 607 (1937), the Delaware court said, "Where * * * the language of the contract is not in any sense ambiguous, its meaning is ordinarily a question of law for the court to ascertain from the instrument itself * * *."

Section 8 of the plan and section 11 of the purchase agreement both provide that "The Participant shall have no interest in shares covered by this option until certificates for said shares are issued." There is no reason to believe that this was a limitation on the passage of legal title but not on the passage of equitable title. This is especially true since section 5(e) of the plan provides that "a Participant shall obtain *no rights as a stockholder until shares are issued to him.*" (Emphasis supplied.)

We are unable to ascertain exactly what rights of ownership petitioner contends were transferred to him prior to January 16, 1957. It seems manifestly clear that if petitioner had "no rights as a stockholder," he could not "own" the stock. Assuming, as petitioner contends, that substantial contract rights accrued to him prior to January 16, 1957, nevertheless, he had no rights of ownership, which was the thing necessary to start the holding period of his stock.

Petitioner's argument that his holding period began when he acquired substantial contract rights is based on a misconception of the asset sold. He did not sell the right to acquire the stock, but sold the stock itself. What he owned as obligee of an executory contract was far different from owning the stock. See *Paul* v. *Commissioner*, 206 F. 2d 763, 765 (C.A. 3, 1953), reversing 18 T.C. 601 (1952) on other grounds, where the Third Circuit rejected a similar argument.

We hold that petitioner's holding period began on January 16, 1957, when the shares of stock were issued to him.

The cases relied on by petitioner do not support his contention that his holding period began when substantial contract rights accrued. In *W. F. Marsh, Edward R. Bacon Co., Mayer* v. *Donnelly*,

---

[4] An option, so long as it remains unaccepted, is a unilateral writing lacking the mutual elements of a contract, but when accepted by the optionee an executory contract arises.

A corporation in the sale and issuance of its stock assumes a contractual relation to the shareholder. *Peters* v. *United States Mortgage Co.*, 13 Del. Ch. 11, 114 Atl. 598 (1921); *Gaskill* v. *Gladys Belle Oil Co.*, 16 Del. Ch. 289, 146 Atl, 337 (1929); *Ellingwood* v. *Wolf's Head Oil Refining Co.*, 27 Del. Ch. 356, 38 A. 2d 743 (1944).

and *C. A. Sporl & Co.*, all *supra*, the courts pointed out that the intention of the parties was controlling as to when there was an acquisition. In the cases of *Philip J. LoBue* and *Estate of James S. Ogsbury*, both *supra*, the question of when stock was acquired was not involved. Those cases involved the question of when a stock option was exercised so as to determine the year in which compensation was includible. The determination of when the option was exercised did not depend on when the stock was acquired.

Petitioner's alternative contention that if his holding period began on January 16, 1957, that it ended on July 22, 1957, when he delivered the stock certificate to his broker is without merit. When stock is sold on a stock exchange, the seller's holding period ends on the day on which the selling order is executed. *Ruml* v. *Commissioner*, 83 F. 2d 257 (C.A. 2, 1936); *Joseph B. Wilson*, 38 B.T.A. 1171 (1938); *Huntington Nat. Bank* v. *Commissioner*, 90 F. 2d 876 (C.A. 6, 1937); *Commissioner* v. *Dashiell*, 100 F. 2d 625 (C.A. 7, 1938); *Dee Furey Mott*, 35 B.T.A. 195 (1936), affirmed per curiam 103 F. 2d 1009 (C.A. 6, 1939); *Fred J. Robinson*, a Memorandum Opinion of this Court, affirmed per curiam 103 F. 2d 1009 (C.A. 6, 1939). Cf. 3B Mertens, Law of Federal Income Taxation, sec. 22.104, p. 446. Furthermore, since petitioner stipulated that the sale took place on July 16, 1957, any argument that there was not a closed and completed transaction on that date is now foreclosed to him. Petitioner's holding period ended July 16, 1957. This is consistent with the proposition that the intention of the parties is controlling.

Since petitioner's holding period began on January 16, 1957, and ended on July 16, 1957, he did not hold his stock for more than 6 months. Accordingly, the respondent's determination is sustained.

*Decision will be entered for the respondent.*