## THE F. S. ROYSTER GUANO COMPANY, A Body Corporate,

*vs.*

## STATE OF MARYLAND, TO THE USE OF MARY E. MacDonald, WIDOW OF JOHN MacDonald, DECEASED.

*Master and servants: warning of hidden dangers; when unnecessary.   Negligence: evidence; when too inconclusive.*

When a person applying for work states that he is being employed at a similar establishment in operating electric hoists and other machinery, it is not negligence in the employer to fail to point out to him the danger in touching the hoist at the part that becomes charged with electricity.        pp. 176-177

Whenever the evidence offered in a case is so inconclusive, or of such a character that no rational mind could infer the fact sought thereby to be established, it is the duty of the court, upon application, to instruct the jury that there is no evidence before them legally sufficient to warrant their finding the facts so attempted to be proved.                              p. 178

*Decided January 31st, 1917.*

Appeal from the Superior Court of Baltimore City. (AMBLER, J.)

The cause was argued before BOYD, C. J., BRISCOE, BURKE, THOMAS, PATTISON, URNER, STOCKBRIDGE and CONSTABLE, JJ.

*Jesse Slingluff* and *Wm. L. Marbury,* for the appellant.

*James J. Lindsay* (with whom were *A. Herman Siskind* and *Chas. P. Coady* on the brief), for the appellee.

PATTISON, J., delivered the opinion of the Court.

The appeal in this case is from a judgment recovered in the name of the State for the use of Mary E. MacDonald against the appellant company, for the death of her husband, John MacDonald, caused as it is alleged, by the negligence of the defendant company.

The declaration alleges in substance that John MacDonald employed as a day laborer by the defendant company in its fertilizer plant in Anne Arundel County, was on or about the 7th day of August, 1914, directed by one of its duly appointed agents to operate an electrical hoist, which was alleged to be dangerous to persons who had no previous experience in its operation, and "that the defendant was negligent and did not warn the said John MacDonald, who did not understand the dangers attending the working around and about said machine; that the said John MacDonald, exercising due and ordinary care and while operating said hoist * * * received an electrical shock in the operation of said hoist which burned the said John MacDonald across his breast and resulted in his almost instant death, etc."

There is but one exception found in the record and that is to the rulings of the Court upon the prayers.

The plaintiff offered but one prayer, and to this the defendant specially excepted, because of the alleged want of legally sufficient evidence "to enable the jury to find that the death of John MacDonald was caused by any negligence on the part of the defendant as alleged in the declaration." The exception was overruled and the prayer was granted.

The defendant company offered six prayers, the fifth and sixth were refused, and it was from the rulings of the Court in granting the plaintiff's prayer, and the overruling of the defendant's special exception thereto, and to the refusal of

the Court to grant its said two prayers, that the defendant excepted.

The defendant by its sixth prayer asked the Court to instruct the jury that there was no legally sufficient evidence in the case "to show that the death of MacDonald was caused by failure of defendant in the performance of any duty which it owed him as alleged in the declaration."

The evidence shows that on the 7th day of August, 1914, John MacDonald was directed by one of the defendant's foremen, in charge of a gang of men, including MacDonald, to relieve temporarily the regular hoister who was at that time operating the electric hoist.

This electrical appliance, used for hoisting cargoes from vessels, scows, etc., to the wharf or plant of the defendant company was located in a tower said to be from 40 to 60 feet above the wharf.

Several witnesses attempted to describe it and to state the manner in which it was operated, but it is difficult, from their testimony, to obtain any clear or definite impression of it, or just how it is operated. It is located in a room about 15 feet square, and in this room are four windows, one of these is used to enable the hoister to see the tub while it is being lowered and hoisted in unloading the boat at defendant's wharf. Upon the side wall of this room about two and a half feet from the window referred to and to the "left and behind" the operator when operating the machine, is a switchboard. The switch, which is upon the switchboard, is described as having a wooden handle some five inches in length used in turning on and off the current. This handle is attached to a wooden cross-piece some two or three inches thick, which is fastened to the metal of the switch, and as the witnesses state, the metal parts of the switch become electrified when the current is on.

The witnesses also speak of a controller and foot brake, the former as we understand it is used in hoisting the tub while the latter is used in lowering it. The empty tub de-

scends to the boat by its own weight and the foot brake is to regulate its speed in descending.

This electric machine or hoist was similar to the ones used by the Baugh Chemical Company and others, and it nowhere appears in the evidence that in its location, construction or operation it was any more dangerous than those ordinarily used for such purposes, or that it exposed the operator to risks beyond those which are incidental to its efficient use. The danger as pointed out by the witnesses for the plaintiff was in the operator coming in contact with the metal parts of the switch; but so long as he used the handle and avoided contact with those parts there was no danger.

The evidence discloses that John MacDonald some weeks before the accident, and while working at Baugh's factory, where he had been employed for a number of years, telephoned to James R. Smith, assistant superintendent of the defendant company, asking him if he could get him employment with his company, and upon being asked what he was doing at Baugh's, he said he was "running a hoist and running an electric car." His application was by Smith communicated to A. V. Decker, the defendant's superintendent, who subsequently employed him. Mr. Decker when asked to state the circumstances under which MacDonald was employed, said: "Mr. MacDonald was working for Baugh's Company and he sent me word that he wanted a situation with me, as hoister * * *. I told him I didn't have an opening at that time, but told him I would take him on as an extra hoister; he sent me word back that he was familiar with running third rail electric cars and when I didn't have any hoisting to do he would run third rail cars or do any light laboring work I had on the job."

His employment commenced "next to the last week in July" and continued to the time of his death, two or three weeks thereafter.

While with the company he was, as stated by Mr. Decker, at work cleaning up around the factory and bagging bone,

·etc., and on two occasions prior to the day of his death he
temporarily relieved the regular hoister in the operation of
the hoist.    That he was so employed on those occasions as
hoister was impressed upon the mind of Decker because of
the fact that at such times he had observed the slowness with
which the hoist was being operated, and in consequence of
which he left his office to find out who was in the tower and
saw Mr. MacDonald there operating the hoist.    He further
stated that "I employed him as an extra hoister.    We al-
ways keep three hoisters on the job if possible; I had prom-
ised him more money when I made him a regular hoister."
Decker was then asked "did you have any occasion to doubt
his ability to run the hoist properly," he answered saying,
"No, sir; because I would not employ a green man in a posi-
tion of that kind."    That he would not put a man to run
an electrical apparatus of that kind with twelve or fifteen
men working under him upon the boat and wharf unless he
thought him experienced.

Gather W. Wright when called to the stand by the plaintiff
testified that about two o'clock in the afternoon of the day
of MacDonald's death, Parks, one of the regular hoisters
called down from the tower asking him to send MacDonald
up to relieve him, and in response to that request he went
with MacDonald to the tower and remained with him about
ten minutes while MacDonald operated the hoist.    "The tub
had gone down in the hole and we were standing there talk-
ing, he had hoisted three or four tubs previous to that; I had
turned around to go down, I saw he was getting along all
right, and I said "now take your time Jack, don't try to
rush," and I turned around to go on down and I heard him
say 'Oh, my God,' and I turned around and looked and he
was kind of falling over; I went back and straightened him
out and laid him straight, so he would not fall up against the
switchboard or get against any of the electrical works; then
I called out of the window for help and thought perhaps the
man had fainted or something like that.    He was not then

dead, but died in ten or fifteen minutes." On cross-examination he was asked why he thought MacDonald had fainted, he answered, "I just saw the man kind of falling like any one would who fainted or had spasms or something like that." He further testified that he with others tried to revive him and in so doing they opened his shirt upon his breast, and rubbed it, but observed no burns upon it, nor did he see any smoke or burns on his clothing, and he did not detect the smell of burning flesh or clothing.

Doctor Horton, the company's physician was sent for but when he arrived ten or fifteen minutes after the accident MacDonald was dead. He, as coroner, thereafter held an inquest and gave a certificate that death resulted from an electrical shock; he testified however, that he removed his clothing, examined the body but found no burns upon it. But the undertaker who thereafter took charge of the body for burial, testified that he saw a large mark across his breast 12 to 14 inches long and possibly one-half to three-fourths of an inch in width. The family physician, Dr. Onnen, whose attention was called to this mark also testified that he observed a mark, of the length and breadth testified to by the undertaker, across the chest of MacDonald from the left to the right nipple, "which he would say was an electrical burn."

Having fully stated the evidence as it appears in the record we must now determine the question presented by the exception whether such evidence is legally sufficient to go to the jury as tending to show the alleged negligence of the defendant in not warning him of the peculiar dangers incident to his employment and that such negligence was the cause of MacDonald's death.

The alleged negligence in this case consists in the defendant's alleged failure to warn MacDonald who as stated in the declaration "had not been employed by the defendants as an operator to operate said hoist" and "who did not understand the dangers attending the work around said machine."

Was it the duty of the defendants in this case to warn MacDonald of such dangers? If it was not its duty, there can

be no negligence because of its failure to do so, and if there be no negligence, though there be an injury, there can be no recovery.

The rule both in England and this country is that the servant does not assume extraordinary and unusual risks of employment, but he does assume all the ordinary and usual risks and perils incident to the employment accepted by him, whether it be dangerous or otherwise, and also all risks which he knows, or may, in the exercise of reasonable care, know to exist, unless there is some agreement to the contrary. The doctrine of assumption of risk rests upon the agreement of the servant with his master, express or implied, from the circumstances of his employment that his master shall not be liable for any injury incident to the service resulting from the known or obvious dangers arising in the performance of the service. 26 *Cyc.* 1179.

The duty of the master to give instructions to the servant is based upon the assumption that the master possesses some knowledge concerning the work and its dangers, that the servant by reason of ignorance or inexperience does not possess. It is the general rule that the servant holds himself out as being capable of doing the work he undertakes to do, and that he assumes the risk incident to the employement. *American Bridge Co.* v. *Valente,* 7 Penn. (Del.) 370, 73 Atl. 400; *Am. & Eng. Ann. Case,* 1912 D. 73.

It is true, some of the witnesses for the plaintiff, who worked at the Baugh factory with MacDonald testified that they had not seen him operating the electrical hoist while there, and that his work at such factory was that of a mixer of fertilizer, but by his own representations to the agents of the defendant who employed him, he, while there, or at least at the time of his employment by the defendant company, was engaged in the operation of the electric hoist, and other electric machinery, and in the absence of any information to the contrary, and without any reason to believe that such representations were untrue, and with the further information,

that he, on two previous occasions had successfully operated the defendant's machine, it was not incumbent upon the defendant company to warn him of the danger complained of, which was obvious to any one accustomed to operate similar electric machinery. If he was so operating the electric hoist at Baugh's factory it can not be said that the dangers to which he was subjected in operating the defendant's hoist, to wit, in coming in contact with its electrified parts were not obvious and known to him.

In this case MacDonald assumed the danger and risk incident to the employment that was solicited and accepted by him; and the burden was not upon the defendant company to warn him of the dangers and risk incident thereto, which were obvious and known or should have been known to him.

But we may further add that were we to hold that it was the defendant's duty to warn him of such dangers and risk incident to his employment and it failed to do so it is not disclosed by the record that his death was the result of their failure to so warn him.

The only witness who was present and the only person that was in a position to speak at all as to how the accident occurred was Wright who testified that as he was leaving the room: "I heard him say 'Oh, My God' and I turned around and looked and he was kind of falling over and I went back and took hold of him and straightened him out and laid him out straight so he would not fall up against the switch board or get against any of the electrical works."

It is not shown by this or any other evidence found in the record how the accident happened, or what MacDonald did that caused him to come in contact with the electrified parts of the machine, if he came in contact with them, and without this information the jury would not be able to say that the accident resulting in MacDonald's death would not have occurred had he been warned by the defendant company, of the danger incident to the operation of the machine.

The evidence we think was too inconclusive to have been submitted to the jury as tending to show that his death was

the result of the failure on the part of the defendant to warn him of the dangers incident to his work.

It is a well established principle or rule of law "that whenever the evidence offered is so inconclusive or of such a character that no rational mind could infer the fact sought to be established by it, it is the duty of the Court, upon application, to instruct the jury, there is no evidence before them legally sufficient to warrant their finding the facts so attempted to be proved. *Brady* v. *Consol. Gas Co.,* 85 Md. 641; *Brinkley* v. *Platt,* 40 Md. 529; *Tyson* v. *Tyson,* 37 Md. 567; *Clarke* v. *Dederick,* 31 Md. 148; *Plank Road* v. *Bruce,* 6 Md. 457.

Applying this well established rule of law to this case we are forced to the conclusion that it should not have been submitted to the jury. We will therefore reverse the judgment below.

*Judgment reversed without a new trial, with*
*costs to the appellant.*