PRUDENTIAL INSURANCE COMPANY *v.* SOLOMON
BROOKMAN

[No. 12, October Term, 1934.]

*Decided December 14th, 1934.*

The cause was argued before BOND, C. J., PATTISON, URNER, ADKINS, PARKE, and SLOAN, JJ.

*John H. Skeen* and *Howard H. Conaway*, with whom were *Emory, Beeuwkes, Skeen & Oppenheimer* on the brief, for the appellant.

*John Y. Offutt*, with whom was *M. Leo Storch* and *James J. Lindsay* on the brief, for the appellee.

BOND, C. J., delivered the opinion of the Court.

The insurance company in this case appeals from a judgment recovered against it on a provision in a life insurance policy for monthly payments to the insured when totally and permanently disabled, physically or mentally, by disability occurring while he was less than sixty years of age, to such an extent that he is rendered wholly, continuously, and permanently unable to engage in any occupation or perform any work for any kind of compensation of financial value, during the remainder of his lifetime. The judgment also included an amount representing premiums paid by the insured when disabled, as he alleged. It is contended by the appellant that the insured, on his own statements, had passed sixty years of age at the inception of the alleged disability; that in fact no legally sufficient evidence of the disability insured against was produced; and that there was error in rulings on offers of evidence and on prayers for instructions to the jury.

The insured was a tailor, doing pressing and repair work, and his evidence was that he had been disabled by an apoplectic or paralytic stroke on November 14th, 1931, brought on when he was run over by an automobile he was cranking. The defendant insurer, on the other hand, produced evidence tending to prove activities of the plaintiff and ability to work since that time.

In the application for the insurance, in 1924, the plaintiff had stated that he was born November 13th, 1880, fifty-one years before the time when, as he says, the accident and disability occurred, and well within the age limit of sixty. But he was a naturalized Russian immigrant, and it appears that, in his application for the naturaliza-

tion, in 1905, and also in his answers to questions for registration as a voter in 1929, under oath, as required by law, he stated that he was born in 1870, or at a time that would render him in 1931 beyond the age covered. The limitation on the coverage in this respect is clear. The relevant provisions of the policy are headed: "Disability before Age 60," and the benefits are contracted to be paid only for disability occurring "while this policy is in full force and effect and the Insured is less than sixty years of age, and before any non-forfeiture provision shall become operative." And the age limit, apparently a stopping place to avoid the ages at which disability would no longer be untimely, would seem to be one of the more important terms of the contract. The effect of the conflict in the statements is to be decided on an exception to the trial court's refusal to direct a verdict for the defendant, and an instruction given to the jury on a prayer of the plaintiff that, if they should find him to have been over sixty years of age according to the statements in the earlier documents, they might nevertheless find a waiver of any defense based on his misstatement of age. The instruction seems to refer only to the effect of a misrepresentation in the application on the validity of the policy, but in another and more important aspect the question raised, and on which the jury were instructed, is one of waiver of the limit of the coverage under the policy, or, in other words, one of extension of the insurance.

This court is of opinion that the conflict in the statements does not remove from the consideration of the jury all possibility that the man may have been born less than sixty years before 1931, but it is also of opinion that insurance against disability occurring beyond sixty years could not be brought about by a waiver.

Despite the conflicting statements, the plaintiff testified at the trial that he was born in 1880; and whatever might be thought of the possibility of a mistake in both the earlier statements, it could not be held to render the present evidence too slight and inconclusive, or a mere scintilla, so that a finding of birth in 1880 would not have

legally sufficient support. *Clarke v. Dederick,* 31 Md. 148, 150; *Royster Guano Co. v. State,* 130 Md. 170, 178, 100 A. 104; *Porter v. Quarry Co.,* 161 Md. 34, 38, 155 A. 428.

But if the jury should find that the man was born sixty years before the occurrence, they could not find the defense on that fact waived, as they were instructed, because while there might be a waiver of a prerequisite to the performance of the insurer's undertaking, a new, extended undertaking could be brought about only by a new contract. In *Bower & Kaufman v. Bothwell,* 152 Md. 392, 136 A. 892, a suit on a policy insuring employers in a factory against loss from strikes of employes, a claim was made for loss from refusal of employees to return at reduced wages after the factory had been closed by the employers themselves. The coverage was "cessation of work by a part or all of the employees," but it was contended that the limitation excluding such a loss from refusal to return had been waived by the company's acceptance of proofs of loss and payments actually made on account of the claim. To this the court answered, page 396 of 152 Md., 136 A. 892, 894: "It is not a forfeiture that is to be found waived, nor a violation of a condition or any irregularity; it is an inapplicability of the policy, so that the waiver argued for would be, in effect, an extension of the contract beyond its defined limits, or a new contract. Such an extension would, at least, we think, require an estoppel, if not a new consideration." And it is doubted whether an estoppel, strictly speaking, could suffice to create a new contract. "We readily agree with counsel for appellant that if the loss was not within the coverage of the policy contract, it cannot be brought within that coverage by invoking the principle of waiver or estoppel. Waiver or estoppel can only have a field of operation when the subject-matter is within the terms of the contract." *Home Ins. Co. v. Campbell Motor Co.* (1933) 227 Ala. 499, 150 So. 486, 489. "In other words, by invoking the doctrine of estoppel and waiver it is sought to bring into existence a contract not made by the parties, to create a liability contrary to the express provisions of the contract the parties

did make." *Ruddock v. Detroit Life Ins. Co.*, 209 Mich. 638, 654, 177 N. W. 242, 248; *Wheeler v. U. S. Casualty Co.*, 71 N. J. Law, 396, 59 A. 347; *McCoy v. Northwestern Mut. Relief Assn.*, 92 Wis. 577, 66 N. W. 697; *Maryland Casualty Co. v. Adams*, 159 Miss. 88, 131 So. 544; *Rosenberg v. Gen. Acc. Fire & Life Assur. Co.* (Mo. App.) 246 S. W. 1009; *Henne v. Glens Falls Ins. Co.*, 245 Mich. 378, 222 N. W. 731; *Ewart, Waiver Distributed*, 135; *Burns v. Prudential Ins. Co.*, 162 Md. 228, 235, 159 A. 606. Whatever the description of the process, it must include the ordinary essentials of a contract, and, among them, a meeting of the minds of the parties on the new undertaking, in this instance an undertaking to insure against disability occurring after the age of sixty as well as before it, if the insured should prove to be so old. And the evidence is not sufficient to show that the parties contemplated that undertaking.

The evidence is substantially this: There had been a delay of some months between the application for this policy and the issue of it, and there was a difference between the statement of age in this application and that in appplications to other companies by the insured, a fact to which the appellant company might have had access. From this it is inferred that the company then satisfied itself of the man's age; but there would seem to be nothing in that to assist in establishing a later agreement on the extension of the insurance written. The company paid disability benefits to the plaintiff until April of 1933, and then stopped, contending that he was not disabled within the purview of the insurance; and this opened a discussion and correspondence on the subject. In the next month, or on May 8th, 1933, an inspector of the company found the statement of age in the plaintiff's naturalization papers and notified the home office of it. This gave the company one of the statements now advanced in conflict with the statement in the application. After that time, and as late as July 20th, 1933, an assistant manager and a manager of a disability claim department wrote the plaintiff three times, reiterating the conclusion that dis-

ability did not exist, and requiring a resumption of premium payments to continue the insurance in effect, received the payments, and stated to the insured that the insurance was then still in force. The record contains no evidence of receipt at the home office of the notice of the statement in the naturalization papers, or of the attitude of the officers with regard to it.

However such facts might in other situations tend to establish a waiver, or to set up an estoppel, they do not serve to show the requisite elements of a contract for the extended coverage. The letters appear to have been confined to the closing of the dispute on existence of disability, ignoring the information of the appearance of the figure 1870 in the insured's naturalization papers. And if it be assumed that they were written with that information at hand, it could not be inferred that the insurer intended any action with respect to it. The two designations of the earlier date were not then both before the insurer, and the single appearance of that date in the naturalization papers does not necessarily mean that the officers of the company attached any importance to it. Nothing in the law required them to do so. The question now is one of fact. Did the insurer offer and agree to extend the insurance to cover disability occurring at the latter age? And the letters do not tend to prove that it did. Moreover, the letters appear to have been written by officers or agents not authorized to make any such extension of the insurance. A clause in the policy expressly excludes modification of any provision except "by endorsement hereon signed by the President, one of the Vice-Presidents, the Secretary, one of the Assistant Secretaries, the Actuary, the Associate Actuary or one of the Assistant Actuaries." An extension of the insurance by a new contract, after the event, to a disability not covered by the policy, would seem to fall inescapably within this prohibition. *Crook v. New York Life Ins. Co.*, 112 Md. 268, 75 A. 388; *Burns v. Prudential Ins. Co.*, 162 Md. 228, 234, 159 A. 606. For these reasons, error is found in the granting of the plaintiff's second prayer, for an instruc-

tion that the defense on the ground of plaintiff's age was precluded by the facts recited. On this evidence, if the plaintiff be found to have exceeded the age limit when disability occurred, he could not recover.

The plaintiff, and a son called as a witness on his behalf, testified that the stroke in 1931 cause complete stoppage of speech and action for a period, that gradually the condition had improved, but that now the father was not able to do any work. The son said that his father was unable to make any extended efforts, that simple exertion tired him and left him almost completely paralyzed. The father, on cross-examination, said further that he had not been in his basement shop, where the pressing is done, since the time of the stroke, and that the work is done by a hired workman. He had, he said, driven his automobile about to collect clothes for pressing, but not since February of 1933, because of fear of the effect on him. In 1932 he called repeatedly at the office of the Baltimore agency of the insurer, and when an agent of the insurer once called on him at his home, he was found covered up in bed with his clothes on, a condition explained by the plaintiff as that in which he took afternoon naps. He said he had, for a while, gone to the basement shop when there was a telephone there, but had discontinued that practice since the telephone was disconnected, because it did not pay. And, as the defendant points out, the plaintiff did appear in court and did testify, so far as appears from the record, in a clear, intelligent manner. The defendant produced evidence tending to prove actual work done by the plaintiff when, as he alleged, he was disabled, but in reviewing the legal sufficiency of all the evidence, this is to be disregarded.

Two physicians were called on behalf of the plaintiff. One. Dr. Wantz, had attended him during the two years after the time of the stroke to the time of trial, in January, 1934. His last previous examination had been in November, 1933, two months before the trial. There had been, he said, a gradual improvement in the plaintiff's condition in some respects, especially in his ability to talk

and to walk, and in his blood pressure, but there was still an unimproved weakness in the leg, arm, and hand on the right side, these being impaired to about fifty per cent. of their strength. A little exercise had been prescribed, but the man was forbidden to crank his car, or to do work with the iron. He was able, and was permitted, in 1932, to deliver a few clothes, carrying them on his left arm. In 1933, he had a bad heart condition, chronic myocarditis, or a disease of the musculature of the heart, which would make labor or exercise tend to produce death, and a softening of the brain which brought on fits of emotionalism. To questions as to disability framed in the words of the provision in the policy, Dr. Wantz answered that the plaintiff was disabled as there described, and explained that his conclusion was based on the fact that the condition he found was progressive and that there might be at any time another and a fatal hemorrhage. Dr. Spear, a psychiatrist, testified to an examination made two months before the trial, and said he found arteriosclerosis of the brain, with alternating high and low blood pressure, and mental confusion, with labored speech which was not clear. He considered the condition permanent, and to like questions, framed in the words of the policy provision, answered that the man was so totally and permanently disabled. A physician called by the defendant expressed the opposite opinion, considering the man not so disabled.

It is true that the issue on the question of disability may easily be misconceived. It is not one of injury or impairment in some or any degree. Partial disability, however great, is not relevant. The insurance that the plaintiff bought was not insurance against reduced earning power, or against loss of health. It was insurance carefully confined to present, complete, and final deprivation of ability to work and earn money, or compensation of money value, in any way. The benefits are secured only if the insured shall become totally and permanently disabled, "to such an extent that he is rendered wholly, continuously and permanently unable to engage in any occu-

pation or perform any work for any kind of compensation of financial value during the remainder of his lifetime." Disability which is complete and final, and can be no greater, is the contingency. When the disability testified to is one of inactivity enforced by fear of consequences of activity, there is danger that the witnesses may not be thinking of the same thing, a danger which is suggested more particularly by the testimony of Dr. Wantz. As it is a matter of common knowledge that men with diseases of the heart and other impairments which render activity liable to produce or accelerate death do, nevertheless, with care, support themselves and lead useful lives for years, the threat of death does not alone show the disability described in this policy. The insured is not relieved from the effort at adaptation made by others; the danger threatening must be imminent, or so close that anybody under that threat must be idle and deprived of power of earning in any way, physical or mental.

But with all these facts granted, the testimony of the physicians in this case that the insured was disabled to the extent stipulated in the policy remains, and must be given its full value, subject to any qualifications which questioning may have brought out. It is not necessary to discuss it further here except with reference to an objection that some of it should not have been received, and should be removed from consideration now. It is objected that opinions elicited from Dr. Spear were based on opinions previously expressed by Dr. Wantz. *McComas v. Wiley*, 134 Md. 572, 580, 108 A. 196. The questions were probably broad enough to render them subject to this objection, but when Dr. Spear's answers are examined, the evil to be feared appears not to have been realized. He had made one examination of the insured and added that he communicated with Dr. Wantz to learn what the accident on November 13th, 1931, had been. Then he based his opinion expressly on the condition found by him. No actual testimony open to this objection appears to have gotten into the case.

A second objection to the testimony of both physicians is that they were asked to give, and in their opinions, did give, verdicts on the question to be answered by the jury. Here, again, the questions asked were open to this objection. When the testimony on the facts is in conflict, or in doubt, opinions cannot be elicited from experts merely on the question to be decided, and the physicians here were asked to give their opinions on the existence of disability within the terms of the policy. *Baltimore & Liberty Turnpike Co. v. Cassell*, 66 Md. 419, 421, 7 A. 805; *Walker v. Rogers*, 24 Md. 237; *Balto. & O. R. Co. v. Thompson*, 10 Md. 76; *Jerry v. Townshend*, 9 Md. 145; review of decisions, 82 *A. L. R.* 1479, etc. The purpose of questions to the physicians as experts should, of course, be confined to opinions on matters of special skill, and they should exclude opinions on the effect of evidence of controverted facts. *State v. Musgrave*, 43 W. Va. 672, 28 S. E. 813; *McCarthy v. Boston Cotton Duck Co.*, 165 Mass. 165, 42 N. E. 568. But it is to be borne in mind that the physicians in this instance were not testifying entirely as experts. Both of them had examined the insured, and testified from personal knowledge of facts, and gave their conclusions on those facts, as well as others testified to. Their answers, all read together, seem to the court to have removed the cause for objection that they were rendering verdicts on the case to be considered and decided by the jury.

For error found in the instruction granted on the plaintiff's second prayer, the judgment is reversed.

> *Judgment reversed and new trial awarded, with costs.*