M. Elizabeth CLAUSON

v.

**PRUDENTIAL INSURANCE COMPANY OF AMERICA.**

No. 59–367–S.

United States District Court
D. Massachusetts.

May 16, 1961.

Julian L. Yesley, Peabody, Koufman & Brewer, Boston, Mass., for plaintiff.

James D. St. Clair, Earle C. Cooley, Hale & Dorr, Boston, Mass., for defendant.

GIGNOUX, District Judge (serving by assignment).

This is an action by the beneficiary named in an individual certificate of insurance issued to Harvey G. Clauson, Sr., under a policy of group life insurance. The certificate under which the plaintiff claims is in the face amount of $50,000. The defendant has paid $30,000 thereof and denies liability for the balance of $20,000, for which this action was brought. The case was tried to the Court without a jury, and the following opinion contains the Court's findings of fact and conclusions of law as required by Rule 52(a) of the Federal Rules of Civil Procedure, 28 U.S.C.A.

On December 11, 1957, after extensive preliminary negotiations, The Prudential Insurance Company of America, the defendant in this action, issued to Chrysler Motors Corporation its Group Policy No. G–14100, which was made retroactively effective as of July 1, 1957. The Policy provided for term life insurance on a contributory basis for owners of Qualified Chrysler Dealerships, as defined in the Policy. It is undisputed that the insured, Harvey G. Clauson, Sr., was such an owner.

Under the terms of the Policy, the amount of insurance to which an owner of a Qualified Dealership was entitled was to be determined annually as of each July 1, and was to be based on the dealer-

ship's Insurance Credit Points as determined by Chrysler and reported to Prudential. This determination was to be made on the basis of the number and type of Chrysler motor vehicles shipped to the dealership during the calendar year preceding such determination in accordance with tables set forth in the Policy. Any determination by Chrysler of a dealership's Insurance Credit Points, or of any facts pertaining thereto, was to be conclusive.

The Policy provided for the payment of quarterly premiums by Chrysler and for the payment of contributions by insured owners in accordance with a schedule of contributions to be established by Chrysler from time to time. Provision was also made in the Policy for the issuance by Prudential to Chrysler, for delivery to each insured owner, of an individual certificate stating the essential features of the insurance to which the owner was entitled and to whom the benefits were payable. The Policy further provided that the Policy, together with the application therefor, constituted the entire contract between the parties, and that it could be amended at any time, without the consent of the insured owners, but only upon written request by Chrysler, agreed to by Prudential, and evidenced by a properly executed written endorsement or amendment. The pertinent provisions of the Policy, summarized above, are set forth in the Appendix.

Harvey G. Clauson, Sr. enrolled in the Group Life Insurance Program on June 14, 1957, prior to the effective date of the Policy, after two conferences with Mr. Robert N. Ingalls, the Boston City Manager for the Dodge Division of Chrysler. Mr. Ingalls had attended several briefing conferences on the program and had been assigned by Chrysler to contact its dealers in the Boston area for the purpose of explaining the program to them and of obtaining from them the documents required for enrollment in the program.

Mr. Ingalls first contacted Mr. Clauson in mid-May, 1957. On this occasion, Mr. Clauson told Mr. Ingalls that he was not certain whether he wanted any insurance, but that if he wanted any insurance at all, he wanted insurance in the amount of $50,000. Mr. Ingalls stated to Mr. Clauson that according to the records of the Dodge Regional Office, copies of which were in Mr. Ingalls' possession at that time, Mr. Clauson was eligible for only $30,000 of insurance, but that Chrysler's Central Office records of the actual shipments from the factory to the dealership during the year 1956 would determine the amount of insurance to which Mr. Clauson was entitled. At the close of the conference, Mr. Ingalls left with Mr. Clauson a pamphlet describing the program and said that he would call again.

A few weeks later Mr. Ingalls telephoned Mr. Clauson, and a second meeting was arranged for Sunday, June 14, 1957, at a golf club in Falmouth, Mass. At this meeting Mr. Ingalls told Mr. Clauson that the deadline for enrollment in the program was the following day. Mr. Clauson stated he was interested in the program, but only if he could obtain insurance in the amount of $50,000. Mr. Ingalls again stated that his records indicated that Mr. Clauson was eligible for a maximum coverage of $30,000. Mr. Clauson stated that he believed Mr. Ingalls' records were incorrect, because his own records showed that he had received during 1956 the number of vehicles necessary for $50,000 insurance. Mr. Ingalls agreed that the Regional Office records could be wrong, and that they might go ahead on the basis of Mr. Clauson's figures, since, as Mr. Ingalls again stated, the final determination of the number of vehicles shipped to Mr. Clauson, and thus the amount of insurance afforded by the program, would depend upon Chrysler's records in Detroit. Accordingly, at this second meeting, Mr. Ingalls completed the Plan Report and Enrollment Card required for enrollment in the program upon the basis of Mr. Clauson's figures, and these documents were executed by Mr. Clauson. The Plan Report stated that during 1956 Chrysler had shipped to Mr. Clauson's dealership

103 Plymouth cars, 90 Dodge cars and 8 light Dodge trucks, and that he had therefore accumulated 219 Insurance Credit Points, qualifying him for insurance in the amount of $50,000. It is undisputed that in fact during 1956 Chrysler had shipped to Mr. Clauson's dealership 73 Plymouth cars, 37 Dodge cars, 11 light Dodge trucks and 2 heavy Dodge trucks, and that he had accumulated only 132.4 Insurance Credit Points, entitling him to insurance in the amount of $30,000.

Mr. Ingalls forwarded the two enrollment documents to the proper offices of Chrysler, and did not talk again with Mr. Clauson about the insurance program. In due course, these two documents were forwarded by Chrysler to Prudential, without any kind of verification by Chrysler against its own records, and Prudential, acting solely in reliance on the figures in the documents, issued to Mr. Clauson its Group Life Insurance Certificate No. 3160, naming the plaintiff as beneficiary, in the amount of $50,000. The date of the issuance of the Certificate does not appear.

The foregoing method of operation had been adopted as the result of a joint decision by Prudential and Chrysler. In setting up the program during the summer and fall of 1957, Prudential and Chrysler had discovered that because of the prior decentralization of Chrysler's records, it was not feasible to verify in advance the shipment data for the 7,000 odd dealers who might enroll in the program for the first policy year, July 1, 1957–July 1, 1958. Instead, they decided that during the first policy year Chrysler would forward to Prudential, without any sort of verification, the dealers' Enrollment Cards and Plan Reports as they were received, and Prudential would issue certificates of insurance solely upon the basis of the dealers' statements in these documents. It was further agreed that for the first policy year verification against Chrysler's records would be made only as claims were filed with respect to any dealers who died during the year. This decision was not communicated to Mr. Clauson or any other dealer, and was not incorporated in any written endorsement or amendment to the Policy.

Mr. Clauson never received any hint or suggestion from either Chrysler or Prudential that the amount of insurance on his life was other than the $50,000 shown in his Certificate, and until the time of his decease he duly paid his contribution to Chrysler's premium calculated on the basis of $50,000 of insurance in force.

Mr. Clauson died accidentally on May 3, 1958, during the first policy year. His widow, the plaintiff, as the beneficiary named in the Certificate, duly filed proof of his death with Prudential and made claim for $50,000. Only then did Chrysler verify against its records the number of its 1956 shipments to Mr. Clauson and determine for the first time that Mr. Clauson was only entitled to $30,000 insurance on the basis of his dealership's Insurance Credit Points. This information was communicated to Prudential, which thereupon refused to pay the plaintiff the $50,000 claimed. The defendant has paid the plaintiff $30,000, and stands ready to refund to Mr. Clauson's estate his contributions toward premium in excess of those required to support $30,000 of insurance.

Plaintiff concedes that under the terms of the Policy Mr. Clauson was entitled to only 132.4 Insurance Credit Points for the year 1956, and on July 1, 1957 was qualified to obtain only $30,000 insurance on his life. Plaintiff contends, however, that she is entitled to recover to the extent of the full amount of the $50,000 insurance stated in the Certificate issued by the defendant to Mr. Clauson on two theories.

Plaintiff's first contention is that the action of Chrysler in forwarding to Prudential the enrollment documents executed by Mr. Clauson constituted a determination by Chrysler of the Insurance Credit Points to which Mr. Clauson was entitled under the terms of the Policy, which by the express provisions of the Policy was conclusive on the defendant.

■ The Court cannot agree. The Court is satisfied that no determination of the total Insurance Credit Points applicable to Mr. Clauson's dealership for the calendar year 1956 was made by Chrysler prior to Mr. Clauson's death. The fair intendment of the Policy surely was that Chrysler's determination as to a dealership's Insurance Credit Points, which was to be conclusive, should involve some affirmative action on the part of Chrysler in verifying from its own records the number of motor vehicle shipments to the dealership for the year involved. The evidence is undisputed that no such verification was in fact made by Chrysler prior to forwarding Mr. Clauson's enrollment documents to the defendant. In fact the evidence affirmatively shows that Chrysler and the defendant had expressly agreed that during the first policy year no such verification would be attempted except as to claims filed on account of dealers who died during the year. It would be a wholly unwarranted construction of the plain language of the Policy to adopt plaintiff's assertion that the mere act of forwarding Mr. Clauson's enrollment documents to Prudential constituted the determination by Chrysler contemplated by the contract.

Plaintiff's second, and alternative, contention raises more substantial questions. Her argument is that even if no determination of Mr. Clauson's Insurance Credit Points was in fact made by Chrysler prior to the issuance of Mr. Clauson's Certificate, the Policy required such a determination, and having issued a Certificate for $50,000 insurance to Mr. Clauson, the defendant is now estopped to deny that such a determination was made. In support of this position plaintiff relies upon the doctrine of equitable estoppel, or estoppel in pais. Defendant attempts to meet this contention by arguing, first, that the Policy did not in terms require a determination by Chrysler of the number of Insurance Credit Points applicable to a particular dealership as of July 1, 1957 for the first policy year; second, that the decision by Chrysler and Prudential with respect to the procedure to be followed during the first policy year was effective as an amendment to the Policy binding upon Mr. Clauson; and, third, that in any event the record is bare of any evidence upon which a claim of estoppel can properly be based.

■ At the outset, the Court cannot accept the defendant's suggestion that the Policy did not contemplate a determination by Chrysler of Mr. Clauson's total Insurance Credit Points as of July 1, 1957, prior to the issuance of the defendant's Certificate of Insurance to him. Although the Policy was not actually issued until December, 1957, it was expressly given an effective date of July 1, 1957. The provisions of Paragraph 4(a) of the Policy relating to a determination state that a dealership's insurance class *shall be determined annually as of each July 1*," on the basis of the number of vehicles shipped by Chrysler to the dealership *"during the calendar year preceding such determination."* Defendant argues that the word "annually" as used in the Policy somehow connotes "once a year after the first year." To the Court it simply means "once a year." Nor can the Court read the phrase "as of each July 1" as the equivalent of "as of July 1, 1958 and as of each July 1 thereafter." [1] Indeed, the

---

1. In Paragraph 4(b) (ii) of the policy this precise language was used by the parties in making provision for adjustments in the amount of insurance to which a dealership was entitled because of changes in a dealership's insurance class in subsequent policy years. Paragraph 4(b) (ii) provides that "as of July 1, 1958 and as of each July 1 thereafter," the dealership insurance class of each qualified dealership will be reviewed by Chrysler and if Chrysler determines that a dealership's insurance credit points for the preceding calendar year place it in a higher dealership insurance class, the owner's insurance will be increased on such July 1, although a decrease in a dealership's total insurance credit points will not reduce the owner's insurance. Defendant relies heavily on Paragraph 4(b) (ii) as qualifying the language used in Paragraph 4(a). It seems clear, how-

construction urged by defendant would leave the Policy completely silent not only as to when, but also as to the manner and basis upon which a dealership's Insurance Credit Points were to be determined for the first policy year. And yet defendant concedes, as it must, that such a determination was to be made by Chrysler on the basis of the dealership's 1956 shipments. While defendant's argument may be ingenious, the Court can find no basis in logic or common sense for distorting the natural and sensible meaning of the language of the Policy to reach such an extraordinary result.

■■ Nor can the Court find any merit in defendant's contention that the arrangement worked out by Chrysler and Prudential for the posthumous verification of claims during the first policy year was effective as an amendment to the Policy, which was binding on Mr. Clauson. The Policy provided that no change in its terms was to be valid unless evidenced by a written endorsement or amendment executed by Chrysler and Prudential.[2] Defendant admits that there was no compliance with this requirement. While it may be conceded that the requirement of a written change might be waived by Chrysler and defendant *inter se*, the weight of authority holds that even a written modification of a group policy by the sole act of the policyholder and the insurer is not binding, without notice, upon one holding a beneficial certificate under the policy, for which he has paid a premium contribution. Annotation, 68 A.L.R.2d 249 (1959). Cf. Parks v. Prudential Ins. Co.

of America, D.C.E.D.Tenn.1951, 103 F. Supp. 493, affirmed per curiam, 6 Cir., 1952, 195 F.2d 302. It certainly follows that an uncommunicated oral modification of an express requirement of a group policy cannot be effective to prejudice the rights of one insured under the policy in the circumstances here disclosed.

The Court thus concludes that the Policy required that Chrysler make a determination as to the number of Insurance Credit Points to which Mr. Clauson was entitled as of July 1, 1957 on the basis of motor vehicle shipments to him during 1956. The Court has previously concluded that Chrysler in fact made no such determination prior to the issuance by Prudential of its Certificate of Insurance to Mr. Clauson and that this was the result of a joint decision by Chrysler and Prudential without notice to Mr. Clauson. There remains for determination the question of whether the plaintiff may invoke the doctrine of equitable estoppel as entitling her to recover in this action.

The early case of Marvel v. Ortlip, 1866, 3 Del.Ch. 9, 42–43, contains the following comprehensive statement of the law of Delaware[3] respecting the doctrine of equitable estoppel:

"The rule is this;—where one by his acts, declarations or silence, where it is his duty to speak, has induced another person, in reasonable reliance on such acts or declarations, to enter into a transaction, he shall not, to the prejudice of the person so misled, impeach the transaction. He need not have acted

---

ever, that Paragraph 4(b) (ii) deals only with the procedure for adjusting the amount of life insurance to which an owner is entitled because of changes in a dealership's insurance credit points based upon an increase or decrease in the number of vehicles shipped by Chrysler to the dealership from year to year. Defendant's construction of Paragraph 4(b) (ii) would render it completely duplicitous of the express provisions of Paragraph 4(a) except for the addition of the year "1958".

**2.** See Appendix, *infra.*

3. The parties have stipulated that the law of Delaware is the law applicable to this action in all its aspects. Although the policy states that it is to be governed by the law of Delaware, there may be some doubt as to whether the law of Delaware or the law of Massachusetts, in which State Mr. Clauson's certificate was presumably delivered, should apply to the plaintiff's claim of estoppel. However, as noted in the text, *infra*, the law of estoppel as declared by the Delaware courts appears to be the same as the law in other jurisdictions, including Massachusetts.

fraudulently, or willfully have misled the other party. The object of the rule is not to punish for fraud or falsehood, but to adjust equitably a loss between two parties one of whom must bear it, and it is considered that he should bear it who has caused it. This is a most beneficent principle, for it enforces good faith and gives security to that trustfulness which must enter much into business transactions and it applies itself not to any special class or sort of cases, but to all dealings between man and man. But it must be observed that equity applies this principle of estoppel cautiously and only in a case clear upon the circumstances, because in doing so it interferes with what otherwise is to the party an admitted legal remedy. Hence it is required that the matter of estoppel, i.e., the facts out of which it arises, be clearly established in evidence; and then the facts so established must present these two requisites, viz.:

1. That the party claiming the estoppel was misled and induced to enter into the transaction upon the faith of the declaration, act or silence of the other, or upon the fact or relation which he seeks to restrain the other party from denying.

2. That his being so misled was not through his own negligence, or want of attention to proper means of information. * * *"

The principles thus stated have been repeatedly applied by the Delaware courts. Timmons v. Campbell, 1955, 35 Del.Ch. 68, 111 A.2d 220; Wolf v. Globe Liquor Co., 1954, 34 Del.Ch. 312, 103 A.2d 774; Colvocoresses v. W. S. Wasserman Co., 1937, 8 W.W.Harr. 253, 38 Del. 253, 190 A. 607; Graham v. National Bank of Smyrna, 1923, 2 W.W.Harr. 264, 32 Del. 264, 122 A. 85. And the law of estoppel as declared by the Delaware courts appears to be in accord with the law generally. Delaware & Hudson Co. v. Boston R. R. Holding Co., 1951, 328 Mass. 63, 102 N.E.2d 67, certiorari denied 1952, 343 U.S. 920, 72 S.Ct. 676, 96 L.Ed. 1333; Cleaveland v. Malden Savings Bank, 1935, 291 Mass. 295, 197 N.E. 14; United States v. Dickinson, 1 Cir., 1938, 95 F.2d 65; United States v. S. F. Scott & Sons, 1 Cir., 1934, 69 F.2d 728; 16 Appleman, Insurance Law and Practice §§ 9081–2, 9088 (1944).

Applying the above principles to the instant case, the plaintiff has made out a clear case for the operation of an estoppel. The Certificate issued by the defendant to Mr. Clauson contained on its face the following statement:

"Amount of Insurance: $ 50000

(as of the Effective Date of this Certificate)

The Owner's amount of life insurance is at all times determined by the provisions of the Group Policy. *The amount of insurance indicated above is that applicable to the Owner under the Group Policy on the effective date of this Certificate,* and such amount is subject to increase and decrease in accordance with the provisions of the Group Policy. The principal provisions of the Group Policy pertaining to amounts of insurance are summarized in this Certificate under 'Plan of Insurance'." (Emphasis supplied.)

As already indicated, the Policy required a determination by Chrysler as of July 1, 1957, through verification of its records for the year 1956, of the number of Insurance Credit Points, and hence of the amount of insurance, to which Mr. Clauson was entitled. This was expressly called to Mr. Clauson's attention by Mr. Ingalls, who informed Mr. Clauson at the time the enrollment papers were completed that Chrysler's shipment records would control. The relevant Policy provisions were also included verbatim in the summary of the Policy incorporated in Mr. Clauson's Certificate. Surely, in the absence of any notice to the contrary, Mr. Clauson was entitled to assume that Chrysler would verify his information against its records in accordance with the

procedures set forth in the Policy and summarized in his Certificate, and upon receipt of defendant's Certificate for $50,000 insurance, to assume further that Chrysler had verified his information and that the indicated amount of insurance was that applicable to him under the Policy on the effective date of the Certificate. It bears emphasis that the crucial consideration in dealing with this claim of estoppel is not what Chrysler and Prudential may have thought they were doing, Wolf v. Globe Liquor Co., supra, but the impact of their inaction and action upon a reasonable man in Mr. Clauson's position. See Colvocoresses v. W. S. Wasserman Co., supra.

Defendant argues strenuously that the Certificate was not a part of the contract of insurance but was stated to be controlled in all respects by the Policy. For present purposes, this may be conceded. Boseman v. Connecticut General Life Ins. Co., 1937, 301 U.S. 196, 203, 57 S.Ct. 686, 81 L.Ed. 1036. Compare John Hancock Mut. Life Ins. Co. of Boston, Mass. v. Dorman, 9 Cir., 1939, 108 F.2d 220, 222.[4] However, even where the certificate is not a part of the contract of insurance, it is recognized that its purpose is to serve as evidence of the insurance afforded to the insured by the policy and that it is issued to the end that the certificate holder "should have the insurer's statement of specified facts in respect of protection to which he had become entitled under the policy." Boseman v. Connecticut General Life Ins. Co., *supra,* 301 U.S. at page 203, 57 S.Ct. at page 690.

The instant Policy states:

*"Owner's Certificate:*

The insurance company will issue to the policyholder, for delivery to each owner insured hereunder, an individual certificate which shall state the essential features of the insurance to which the owner is entitled, to whom the benefits are pay-

able and the provisions of the section 'conversion privilege'."

This language of the Policy is not ambiguous. By it the defendant said to Mr. Clauson, "Your Certificate states the essential features of the insurance to which you are entitled." The Court can only conclude that Mr. Clauson was entitled to rely upon the statements made by the defendant in the Certificate which the Policy required the defendant to give him, at least insofar as they reflected the determination of facts crucial to the amount of insurance to which he was entitled.

■ It may be argued, of course, that Mr. Clauson was misled through his own negligence, and that the first misrepresentation of fact in the instant case emanated from him when he reported that he had accumulated more than 200 Insurance Credit Points on the basis of vehicle shipments to him during 1956. There is no suggestion, however, of fraud, conscious concealment, or other improper conduct on Mr. Clauson's part. Nor is there any indication in this record that Mr. Clauson was stating other than his honest belief as to the number of vehicles shipped to him by Chrysler during 1956. Having been assured by Mr. Ingalls that Chrysler's records would control in the last analysis, Mr. Clauson could hardly have been negligent in assuming that the clear direction of the Policy would be carried out, and that his figures would be verified by Chrysler before a Certificate was issued to him. Certainly, a reasonable man in Mr. Clauson's position, who knew that there was some doubt concerning his records of car shipments, who knew that Chrysler was required to verify his records against its records, which were to be controlling, and who could not help but be anxious concerning the matter, upon receipt of defendant's Certificate would believe that Chrysler had made the required verification and that his records had been correct after all.

4. The Certificate is not included among the documents declared by the Policy to constitute the contract between the parties. Nor, as in Dorman, *supra,* does it appear that the Certificate contains provisions as to benefits which are not contained in the Policy.

And his belief could only be reinforced by Chrysler's acceptance and retention until his death of his premium contributions calculated on the basis of $50,000 of insurance. Cf. 16 Appleman, supra c. 325. For the purposes of the handling of the Policy and the collection of contributions and payment of premiums, the more equitable view is that Chrysler was acting as Prudential's agent. John Hancock Mut. Life Ins. Co. of Boston, Mass. v. Dorman, supra, 108 F.2d at 222–223; Baum v. Massachusetts Mut. Life Ins. Co., Okl.1960, 357 P.2d 960. See 1 Appleman, supra § 43.

■■ Defendant correctly points out that plaintiff has the burden of proving by clear evidence the facts upon which her claim of estoppel is based, including a change of position by Mr. Clauson, to his detriment, in reliance upon defendant's action or inaction. United States v. Dickinson, supra, 95 F.2d at 68. The Court feels that plaintiff has sustained this burden. Under the circumstances disclosed by this record, the inference is clear that Mr Clauson was not interested in $30,000 worth of insurance, but that he wanted more, and that he would not have entered into or continued in the transaction except upon the basis of the $50,000 coverage represented by defendant's Certificate. Moreover, as has already been mentioned, for the better part of a year Mr. Clauson paid premium contributions calculated on the basis of $50,000 insurance. Even if prior to his death Mr. Clauson might have been made whole by a refund of a portion or all of his contributions, no such action can make his widow whole after his death because the risk has been determined and a relatively slight change of position has been rendered very much greater by circumstances beyond the control of any party. As is the case with any aleatory contract, a party who has failed to make a timely assertion of his rights may be foreclosed from taking advantage of them after a lapse of time in which the risk has been determined. Cf. Restatement, Contracts § 293 (1932).

The Court's conclusion that this case is an appropriate one for invoking the doctrine of equitable estoppel is supported by the holding of the Court of Appeals for the Ninth Circuit in the case of John Hancock Mut. Life Ins. Co. of Boston, Mass. v. Dorman, supra. In that case a group insurance policy provided death and disability coverage for the policyholder's employees. The insured was a member of the board of directors of the policyholder, serving without pay. The insurer denied liability under the policy on the ground that the insured was not an "employee" within the meaning of the policy. The court held that he was, and also that in any event the incontestability clause in the policy barred the insurer from asserting otherwise. Although not strictly necessary to its decision, the court alternatively held that the insurer was estopped by its acceptance of premiums from denying coverage. On this last point, the court stated (108 F.2d at 224):

"Assuming, contrary to our holding, that the deceased director was not an employee, we agree that the incontestability clause does not apply to the required proof of the existence of employment at the time of the insured's death. However, in this case the insurance company, through its agent in the handling of the policy, which included both the determination of the employment character of the insured and the collection of the premium contribution required by the printed provisions of the certificate to keep the policy in existence, for over a year accepted the monthly payment of the insured's premium. Such an acceptance of the monthly premiums by the insurer, here 'handling' the insurance through its agent, in our opinion constitutes an estoppel to assert that the status existing at the time of death, shown to be identical in fact with the status existing at the time of making of the policy, was not that of employee. This estoppel by accept-

ance of premiums by the insurance company's agent in our opinion applies as well to the contention that the insured was not an employee at the time of the issuance of the policy and would control our decision in that regard even though there were no incontestability clause in the policy."

The Supreme Court of Wisconsin reached a similar conclusion in Riske v. National Casualty Co., 1954, 268 Wis. 199, 67 N.W.2d 385. In that case a group health and accident policy originally included within the defined class of dependents eligible for benefits the "spouse" of the insured. The policy was subsequently amended, without notice to the plaintiff insured, to include only the "wife" of the insured. At approximately the same time an amended certificate was issued to the insured which included "spouse" within the coverage. The policy provided for the issuance by the insurer to each covered employee of a certificate setting forth the essential features of the policy and the coverage afforded. The certificate stated that it was in all respects controlled by the policy. In holding that the insurer was estopped to deny that the insured's husband was an eligible dependent, the court stated (67 N.W.2d at 389):

"Under the circumstances before us we must hold that the learned trial court was in error in ignoring the certificate relied upon by the appellant. *We need not hold that it has become a part of the insurance contract contrary to the declarations of both policy and certificate, but we have no doubt that the certificate, issued under the representations of the policy itself to an insured who has contributed to the premium, effectively estops the respondent from showing that the coverage, conditions and limitations of the policy are different from those stated in the certificate and which the policy*

*proclaims will be found there.* We hold, therefore, that, for the purposes of this action, appellant's spouse is her dependent and she is entitled to the benefits which the policy provides for the disability of one." (Emphasis supplied.)

See 1 Appleman, *supra* § 46. Cf. Ivey v. United National Indemnity Co., 9 Cir., 1958, 259 F.2d 205; Parks v. Prudential Ins. Co. of America, *supra*, 103 F.Supp. at page 497.

The above cases are the only ones called to the Court's attention in which a claim of estoppel was made under circumstances even remotely resembling those presented in the present action. Thus the cases of Fisher v. United States Life Ins. Co., 4 Cir., 1957, 249 F.2d 879 and Washington National Ins. Co. v. Burch, 5 Cir., 1959, 270 F.2d 300, both cited by the defendant, deal only with the effect of an incontestability clause, an issue not present in the case at bar.[5] In the former, it is expressly stated that no question of estoppel was before the court, and in the latter the question of estoppel was expressly reserved for remand. Similarly, in the case of Walls v. Connecticut General Life Ins. Co., D.C.D.C.1949, 82 F. Supp. 421, upon which defendant also relies, the doctrine of estoppel was evidently not argued, nor could it have applied, and it certainly was not discussed or ruled upon by the court. In Collier v. Metropolitan Life Ins. Co., D.C.D.C.1949, 82 F.Supp. 529, the question of estoppel arose under circumstances completely different from those presented by the case at bar.

Defendant's final contention is that even if the elements of an estoppel are present in this record, this case is not one in which the insurer is seeking to enforce a forfeiture for breach of a warranty or condition contained in the policy, but a case regarding the extent of the coverage provided by the policy, and defendant relies upon a line of authorities which states that the doctrine of es-

---

5. Although the instant policy contained a 1-year incontestability clause, Mr. Clauson died within that year.

toppel cannot be invoked to extend the coverage of an insurance policy to a loss or risk not within its terms. See C. E. Carnes & Co. v. Employers' Liability Assur. Corp., 5 Cir., 1939, 101 F.2d 739; Fidelity & Guaranty Fire Corp. of Baltimore v. Bilquist, 9 Cir., 1938, 99 F.2d 333, 335; Hunter v. Jefferson Standard Life Ins. Co., 1955, 241 N.C. 593, 86 S.E. 2d 78; Palumbo v. Metropolitan Life Ins. Co., 1935, 293 Mass. 35, 199 N.E. 335; Prudential Ins. Co. of America v. Brookman, 1934, 167 Md. 616, 175 A. 838.

This Court's holding is in no way inconsistent with these cases. In the first place, not one of them presents a factual situation similar to that in the instant case, and in most, if not all, of these cases the elements of an estoppel are not present. See Annotation, 113 A.L.R. 857, 858 (1938). Furthermore, the defendant's flat statement of the doctrine of these cases, if made without mental reservations, is wrong. 16 Appleman, *supra* § 9090 at 629, note 35. See Ivey v. United National Indemnity Co., *supra*; Riske v. National Casualty Co., *supra*. But even assuming defendant's statement of the doctrine of these cases to be correct, the case at bar is not one in which the plaintiff is seeking to extend or modify the coverage of the Policy in any way. On the contrary, the risk of having to pay $50,000 on account of the death of Mr. Clauson was within the express coverage of the Policy if Chrysler determined, prior to the issuance of the Certificate, that Mr. Clauson had accumulated more than 200 Insurance Credit Points in 1956. This Court is doing no more than estopping the defendant from denying that Chrysler made such determination and is holding only that, for the purposes of this case, Chrysler determined that Mr. Clauson had accumulated more than 200 Insurance Credit Points even though in fact it had not done so. This being established for the purposes of this case, under the express provisions of the Policy Mr. Clauson was entitled to $50,000 insurance.

The Court thus concludes that, under the circumstances here disclosed, the defendant is estopped to deny that the amount of insurance to which Harvey G. Clauson, Sr. was entitled under the Policy was different from that stated in the Certificate. It follows that judgment must be entered for the plaintiff in the amount of $20,000, with interest and costs.

It is so ordered.

### Appendix
Pertinent provisions of The Prudential Insurance Company of America Group Policy No. G–14100 as summarized in the opinion:

"Plan of Insurance

\* \* \* \* \* \*

4. The amount of insurance applicable to each Owner insured under this Policy with respect to a Qualified Dealership shall be determined on the basis of his Ownership Interest in such Dealership and the Dealership Insurance Class of such Dealership, as hereinafter provided.

(a) Dealership Insurance Class—The Dealership Insurance Class of a Qualified Dealership shall be determined annually as of each July 1 in accordance with Table II below, and shall be based on the Dealership's Insurance Credit Points, in accordance with Table I below, as determined by the Policyholder [Chrysler] and reported to the Insurance Company, as follows:

(i) In the case of a Direct Dealer, any such determination shall be made on the basis of the number of new vehicles shipped to the Dealership by the Policyholder, Chrysler Corporation or a Dodge Truck Center during the calendar year preceding such determination, less the number of new vehicles sold by the Dealership to an Associate Dealership during such calendar year as reported to the Policyholder on 'Monthly Affidavit of Direct Dealer Deliveries of Motor Vehicles to Associate Dealers'.

(ii) \* \* \*

\* \* \* \* \* \*

### Table I

| Vehicle | Insurance Credit Points |
|---|---|
| Plymouth | 1.00 |
| Dodge | 1.20 |
| DeSoto | 1.35 |
| Chrysler | 1.50 |
| Imperial | 2.30 |
| Dodge Truck (light– 1½ ton or less) | 1.00 |
| Dodge Truck (heavy– over 1½ ton) | 2.00 |

### Table II

| Total Insurance Credit Points | Dealership Insurance Class |
|---|---|
| 500 or more | 1 |
| 300 or more but less than 500 | 2 |
| 200 or more but less than 300 | 3 |
| 100 or more but less than 200 | 4 |
| 50 or more but less than 100 | 5 |
| Less than 50 | 6 |

While an Owner of a Dealership is insured under this Policy with respect to such Dealership, the Dealership Insurance Class of such Dealership shall in no event be changed on account of a reduction in Total Insurance Credit Points applicable to such Dealership.

\* \* \* \* \* \*

(b) *Amount of Insurance On An Owner Prior To His 65th [6] Birthday*—

(i) Subject to the further provisions hereof, the amount of insurance for an insured Owner with respect to a Dealership prior to his 65th birthday shall be determined in accordance with Table III below.

### Table III

Amount of Insurance According to Ownership Interest

| Dealership Insurance Class | 80% or more [7] | 50% but under 80% | 20% but under 50% |
|---|---|---|---|
| 1 | $100,000 | $75,000 | $50,000 |
| 2 | 75,000 | 56,250 | 37,500 |
| 3 | 50,000 | 37,500 | 25,000 |
| 4 | 30,000 | 22,500 | 15,000 |
| 5 | 15,000 | 11,250 | 7,500 |
| 6 | 10,000 | 7,500 | 5,000 |

The amount of an Owner's insurance with respect to any one Qualified Dealership shall be that provided above without right to a larger or smaller amount, except as hereinafter provided. \* \* \*

\* \* \* \* \* \*

(ii) As of July 1, 1958 and as of each July 1 thereafter, the Policyholder shall determine each Dealership's Total Insurance Credit Points for the immediately preceding calendar year, and, if the Total Insurance Credit Points applicable to a Dealership would result in a change in the Dealership Insurance Class of such Dealership, the Policyholder shall report such change to the Insurance Company.

6. It is undisputed that Mr. Clauson was under 65 when he died.

7. It is undisputed that Mr. Clauson was the sole owner of Clauson's Garage, Inc., and came within this class.

However, in the case of a Dealership which has not been in business for a full calendar year, then as of the first day of each calendar quarter the Policyholder shall determine and report to the Insurance Company such Dealership's Total Insurance Credit Points for the first twelve months of business or the full period of business if less than twelve months. If the Dealership Insurance Class of a Qualified Dealership with respect to which an Owner is insured under this Policy changes as of any such date to the extent that a greater amount of insurance is provided under (b) (i) immediately above with respect to such Owner, the amount of insurance for such Owner with respect to such Dealership shall be increased to such greater amount as of the date of such change in class. However, if such Owner is then absent from work due to illness or injury, the increase in his amount of insurance will become effective on the date he returns to work.

\* \* \* \* \*

5. For the purposes of this Policy, any determination by the Policyholder of a Dealership's Insurance Credit Points, or of an Owner's Ownership Interest in a Dealership, or of any facts pertaining thereto, shall be conclusive.

### Contributions of Insured Owners

"The contributions required of the individual Owners for Insurance under this Policy shall be determined by the schedule of contributions established by the Policyholder from time to time.

Premiums under this Policy are payable by the Policyholder at an office of the Insurance Company or to an authorized representative. Such premiums are due and payable as specified on the first page of this Policy.

\* \* \* \* \* \*

### Records—Information To Be Furnished

"The Insurance Company shall keep a record of the Owners insured containing, for each such Owner, the essential particulars of the insurance. The Policyholder shall periodically forward to the Insurance Company, on the Insurance Company's forms, such information concerning the Owners eligible for the insurance under this Policy as may reasonably be considered to have a bearing on the administration of the insurance under this Policy and on the determination of the premium rates. Such records of the Policyholder as have a bearing on the insurance shall be open for inspection by the Insurance Company at any reasonable time.

\* \* \* \* \* \*

### Owner's Certificate

The Insurance Company will issue to the Policyholder, for delivery to each Owner insured hereunder, an individual certificate which shall state the essential features of the insurance to which the Owner is entitled, to whom the benefits are payable and the provisions of the section 'Conversion Privilege'.

\* \* \* \* \* \*

### The Contract

This Policy, together with the Application of the Policyholder, a copy of which is attached hereto or endorsed hereon and made a part hereof, constitutes the entire contract between the parties. All statements made by the Policyholder shall be deemed representations and not warranties and no such statement shall avoid the insurance under this Policy or be used in defense of a claim hereunder unless it is contained in the Application signed by the Policyholder.

This Policy may be amended at any time, without the consent of the Owners insured hereunder or any other person having a beneficial interest therein, upon written request made by the Policyholder and agreed to by the Insurance Company, but any such amendment shall be without prejudice to any claim arising prior to the date of the change. No Agent is authorized to alter or amend this Policy, to waive any conditions or restrictions contained herein, to extend the time for paying a premium, or to bind the Insurance Company by making any promise or representation or by giving or receiving any information. No change in this Policy shall be valid unless evidenced by an

endorsement hereon signed by the President, a Vice President, the Secretary, the Actuary, an Associate Actuary, an Assistant Secretary or an Assistant Actuary of the Insurance Company, or by an amendment hereto signed by the Policyholder and by one of the aforesaid officers of the Insurance Company."